**Lansing, Michigan**

# Opinion

Chief Justice:        Justices:
Marilyn Kelly        Michael F. Cavanagh
                     Elizabeth A. Weaver
                     Maura D. Corrigan
                     Robert P. Young, Jr.
                     Stephen J. Markman
                     Diane M. Hathaway

FILED JULY 31, 2010

S T A T E   O F   M I C H I G A N

SUPREME COURT

RODNEY MCCORMICK,

      Plaintiff-Appellant,

v                               No. 136738

LARRY CARRIER,

      Defendant,

and

ALLIED AUTOMOTIVE GROUP, INC.,
indemnitor of GENERAL MOTORS
CORPORATION,

      Defendant-Appellee.

---

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

The issue in this case is the proper interpretation of the "serious impairment of body function" threshold for non-economic tort liability under MCL 500.3135. We hold that *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004), was wrongly decided because it departed from the plain language of MCL 500.3135, and is therefore overruled.

We further hold that, in this case, as a matter of law, plaintiff suffered a serious impairment of a body function. Accordingly, we reverse and remand the case to the trial court for proceedings consistent with this opinion.

## I. FACTS AND PROCEEDINGS

This case arises out of an injury that plaintiff, Rodney McCormick, suffered while working as a medium truck loader at a General Motors Corporation (GM) plant.[1] Plaintiff's job mainly consisted of assisting in the loading of trucks, which required climbing up and around trucks and trailers, standing, walking, and heavy lifting. He generally worked nine- to ten-hour shifts, six days a week.

On January 17, 2005, a coworker backed a truck into plaintiff, knocking him over, and then drove over plaintiff's left ankle. Plaintiff was immediately taken to the hospital, and x-rays showed a fracture of his left medial malleolus.[2] Plaintiff was released from the hospital that day, and two days later metal hardware was surgically inserted into his ankle to stabilize plaintiff's bone fragments. Plaintiff was restricted from weight-bearing activities for one month after the surgery and then underwent multiple months of physical therapy. The metal hardware was removed in a second surgery on October 21, 2005.

---

[1] The only defendant remaining at this point in the case is GM's indemnitor, Allied Automotive Group, Inc, because the parties have stipulated the release of the other original defendants. For simplicity's sake, the opinion will use "defendant" to refer to this entity.

[2] The medial malleolus is the bony prominence that protrudes from the medial side of the ankle. *Stedman's Medical Dictionary* (26th ed).

At defendant's request, plaintiff underwent a medical evaluation with Dr. Paul Drouillard in November 2005. He indicated that plaintiff could return to work but was restricted from prolonged standing or walking. On January 12, 2006, the specialist who performed plaintiff's surgeries cleared him to return to work without restrictions. The specialist's report noted that plaintiff had an "excellent range of motion," and an x-ray showed "solid healing with on [sic] degenerative joint disease of his ankle."

Beginning on January 16, 2006, plaintiff returned to work as a medium truck loader for several days, but he had difficulty walking, climbing, and crouching because of continuing ankle pain. He requested that his job duties be restricted to driving, but defendant directed him to cease work.

Defendant required plaintiff to undergo a functional capacity evaluation (FCE) in March 2006. The FCE determined that plaintiff was unable to perform the range of tasks his job required, including stooping, crouching, climbing, sustained standing, and heavy lifting. This was due to ankle and shoulder pain,[3] a moderate limp, and difficulty bearing weight on his left ankle. The report stated that plaintiff's range of motion in his left ankle was not within normal limits and that difficulty climbing and lifting weights had been reported and observed.

In May 2006, Dr. Drouillard examined plaintiff again and reported that plaintiff could return to work. Dr. Drouillard's report stated that plaintiff complained of ankle and

---

[3] Plaintiff had a pre-existing back and shoulder injury that is unrelated to the incident in this case.

3

foot pain, but the doctor found "no objective abnormality to correspond with his subjective complaints."  In June 2006, plaintiff also underwent a magnetic resonance imaging (MRI) test, which showed some postoperative scar and degenerative tissue formation around his left ankle.  At plaintiff's request, another FCE was performed on August 1, 2006, which affirmed that plaintiff could return to work without restriction and was capable of performing the tasks required for his job.  The report stated that plaintiff complained of "occasional aching" and tightness in his ankle, but it did not appear to be aggravated by activities such as prolonged standing or walking.  It also noted that plaintiff's range of motion in his left ankle was still not within normal limits, although it had improved since the March 2006 FCE.

Plaintiff returned to work on August 16, 2006, 19 months after he suffered his injury.  He volunteered to be assigned to a different job, and his pay was not reduced.  He has been able to perform his new job since that time.

On March 24, 2006, plaintiff filed suit, seeking recovery for his injuries under MCL 500.3135.  In his October 2006 deposition, plaintiff testified that at the time of the incident, he was a 49-year-old man and his normal life before the incident mostly consisted of working 60 hours a week as a medium-duty truck loader.  He stated that he also was a "weekend golfer" and frequently fished in the spring and summer from a boat that he owns.  He testified that he was fishing at pre-incident levels by the spring and

summer of 2006, but he has only golfed once since he returned to work.[4]  He stated that he can drive and take care of his personal needs without assistance and that his relationship with his wife has not been affected.  He stated that he has not sought medical treatment for his ankle since January 2006, when he was approved to return to work without restriction.  He further testified that his life is "painful, but normal," although it is "limited," and he continues to experience ankle pain.

The trial court granted defendant's motion for summary disposition on the basis that plaintiff had recovered relatively well and could not meet the serious impairment threshold provided in MCL 500.3135(1).  The Court of Appeals affirmed, with one judge dissenting.  *McCormick v Carrier*, unpublished opinion per curiam of the Court of Appeals, issued March 25, 2008 (Docket No. 275888).  The majority held that, under *Kreiner*, plaintiff's impairment did not affect his ability to lead his normal life because he is able to care for himself, fish and golf, and work at the same rate of pay.  The dissent disagreed, arguing that two doctors had determined that the impairment would cause

---

[4] There are no facts in the record regarding the extent to which plaintiff fished between January 2005 and January 2006 or the extent to which he was able to golf in the period between the incident and when he returned to work, despite the arguments to the contrary by both parties and the dissent.  Defendant has alleged that plaintiff was able to fish while he was not working, but the only factual support it cites is plaintiff's statement that he fished in the six or seven months after January 2006, which was when he was initially cleared to return to work, and when he actually returned to work.  Although plaintiff's counsel agreed in the arguments before the trial court that plaintiff had been fishing, it was unclear as to what time period he was referring.  In plaintiff's brief to this Court, he alleges that by the time of his deposition, he had "returned" to fishing with the same frequency as before the accident, which suggests that plaintiff might be arguing that his fishing activities were interrupted.

5

problems over plaintiff's entire life and his employer had determined that he could not perform his work duties, the main part of his "normal" life.

After initially denying leave to appeal, this Court granted plaintiff's motion for reconsideration, vacated its prior order, and granted the application for leave to appeal. *McCormick v Carrier*, 485 Mich 851 (2009).

## II. STANDARD OF REVIEW

This Court reviews a motion for summary disposition de novo. *In re Smith Trust*, 480 Mich 19, 23-24; 745 NW2d 754 (2008). The proper interpretation of a statute is a legal question that this Court also reviews de novo. *Herman v Berrien Co*, 481 Mich 352, 358; 750 NW2d 570 (2008).

## III. ANALYSIS

The issue presented in this case is the proper interpretation of MCL 500.3135. We hold that *Kreiner* incorrectly interpreted MCL 500.3135 and is overruled because it is inconsistent with the statute's plain language and this opinion. Further, under the proper interpretation of the statute, plaintiff has demonstrated that, as a matter of law, he suffered a serious impairment of body function.

### A. OVERVIEW OF MCL 500.3135

In 1973, the Michigan Legislature adopted the no-fault insurance act, MCL 500.3101 *et seq*. The act created a compulsory motor vehicle insurance program under which insureds may recover directly from their insurers, without regard to fault, for qualifying economic losses arising from motor vehicle incidents. See MCL 500.3101 and 500.3105. In exchange for ensuring certain and prompt recovery for economic loss, the

6

act also limited tort liability. MCL 500.3135. See also *DiFranco v Pickard*, 427 Mich 32, 40-41; 398 NW2d 896 (1986). The act was designed to remedy problems with the traditional tort system as it relates to automobile accidents. These included that "[the contributory negligence liability scheme] denied benefits to a high percentage of motor vehicle accident victims, minor injuries were overcompensated, serious injuries were undercompensated, long payment delays were commonplace, the court system was overburdened, and those with low income and little education suffered discrimination." *Shavers v Attorney General*, 402 Mich 554, 579; 267 NW2d 72 (1978).

Under the act, tort liability for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle is limited to a list of enumerated circumstances. MCL 500.3135(3). The act creates threshold requirements in MCL 500.3135(1), which has remained unchanged in all key aspects since the act was adopted. That subsection currently provides that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement."

The threshold requirement at issue in this case is whether plaintiff has suffered "serious impairment of body function." The act did not originally define this phrase. Accordingly, it initially fell to this Court to do so, and the result was a series of differing opinions. In *Cassidy v McGovern*, 415 Mich 483; 330 NW2d 22 (1982), this Court held that whether the serious impairment threshold is met is a question of law for the court to decide where there is no material disputed fact. *Id.* at 502. It further held that in order to

7

meet the threshold, the plaintiff must show an objectively manifested injury and an impairment of an important body function, which it defined as "an objective standard that looks to the effect of an injury on the person's general ability to live a normal life." *Id.* at 505. This Court later in part modified and in part affirmed *Cassidy* in *DiFranco*, *supra*. The *DiFranco* Court agreed that a plaintiff had to suffer an objectively manifested injury, but it rejected the *Cassidy* Court's determination that the impairment needed to be "important" and its definition of "important." *DiFranco*, 427 Mich at 61-67, 70-75. The *DiFranco* Court further held that whether the threshold is met is a question of law for the court only if there are no material disputed facts and the facts could not support conflicting inferences. *Id.* at 53-54.

In 1995, however, the Legislature intervened. It amended MCL 500.3135 to define a "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7). The Legislature also expressly provided that whether a serious impairment of body function has occurred is a "question[] of law" for the court to decide unless there is a factual dispute regarding the nature and extent of injury and the dispute is relevant to deciding whether the standard is met. MCL 500.3135(2)(a). Thus, the Legislature incorporated some language from *DiFranco* and *Cassidy* but also made some significant changes.[5]

---

[5] Some courts have broadly stated that the Legislature rejected *DiFranco* in favor of *Cassidy*, see *Kreiner*, 471 Mich at 121 n 8, but that is an oversimplification. Some of the language adopted by the Legislature was used consistently in *both DiFranco* and

8

This Court interpreted the amended provisions in 2004, in *Kreiner*. The question before this Court is whether the *Kreiner* majority properly interpreted the statute, and, if not, whether its interpretation should be overruled.

## B. INTERPRETATION OF MCL 500.3135

The primary goal of statutory construction is to give effect to the Legislature's intent. *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 76; 780 NW2d 753 (2010). This Court begins by reviewing the language of the statute, and, if the language is clear and unambiguous, it is presumed that the Legislature intended the meaning expressed in the statute. *Id.* Judicial construction of an unambiguous statute is neither required nor permitted.[6] *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). When reviewing a statute, all non-technical "words and phrases shall be construed and understood according to the common and approved usage of the language," MCL 8.3a, and, if a term is not defined in the statute, a court may consult a dictionary to aid it in this goal. *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas*

*Cassidy*, and the Legislature clearly rejected some elements of *Cassidy*. The similarities and differences between *DiFranco* and *Cassidy* and the amendments to MCL 500.3135 will be discussed below to the extent that they are significant. Although the dissent disagrees in the abstract with my statement that it is an oversimplification to state that the Legislature merely rejected *DiFranco* in favor of *Cassidy*, I can only conclude that it is unable to support this accusation with any specific, substantive arguments, given that it fails to expressly address or reject my more nuanced analysis of each of the specific phrases that the Legislature adopted or rejected from *Cassidy* and *DiFranco*.

[6] This Court's members disagree on when a statute is ambiguous. See *Petersen v Magna Corp*, 484 Mich 300, 310-313 (opinion by KELLY, C.J.), 339-342 (opinion by HATHAWAY, J.); 773 NW2d 564 (2009). We need not address that issue here because MCL 500.3135 is unambiguous under any of the views.

9

*Guaranty Ass'n*, 456 Mich 590, 604; 575 NW2d 751 (1998). A court should consider the plain meaning of a statute's words and their "'placement and purpose in the statutory scheme.'" *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999) (citation omitted). "Where the language used has been subject to judicial interpretation, the legislature is presumed to have used particular words in the sense in which they have been interpreted." *People v Powell*, 280 Mich 699, 703; 274 NW 372 (1937). See also *People v Wright*, 432 Mich 84, 92; 437 NW2d 603 (1989).

### 1. A QUESTION OF LAW OR FACT UNDER MCL 500.3135(2)

The first step in interpreting MCL 500.3135 is to determine the proper role of a court in applying MCL 500.3135(1) and (7). The Legislature addressed this issue in the amended MCL 500.3135(2)(a), which states in relevant part:

> The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
>
> (i) There is no factual dispute concerning the nature and extent of the person's injuries.
>
> (ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement.

Under the plain language of the statute, the threshold question whether the person has suffered a serious impairment of body function should be determined by the court as a matter of law as long as there is no factual dispute regarding "the nature and extent of the person's injuries" that is material to determining whether the threshold standards are

10

met.[7]  If there is a material factual dispute regarding the nature and extent of the person's

injuries, the court should not decide the issue as a matter of law.[8]  Notably, the disputed

---

[7] Notably, MCL 500.3135(2)(a) could unconstitutionally conflict with MCR 2.116(C)(10) in those cases wherein a court is required to (1) resolve material, disputed facts with regard to issues *other* than the nature and extent of the injury, such as the extent to which the injury actually impairs a body function or the injured party relied on that function as part of his or her pre-accident life, or (2) decide whether the threshold is met even though reasonable people could draw different conclusions from the facts.  See *Skinner v Square D Co*, 445 Mich 153, 161-162; 516 NW2d 475 (1994), and *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 357; 596 NW2d 190 (1999).

Given that the allocation of decision-making authority between a judge and a jury is "a quintessentially procedural determination," *Shropshire v Laidlaw Transit, Inc*, 550 F3d 570, 573 (CA 6, 2008), this potential conflict raises questions as to whether the Legislature may have unconstitutionally invaded this Court's exclusive authority to promulgate the court rules of practice and procedure to the extent that MCL 500.3135(2)(a) is merely procedural.  See *Perin v Peuler* (*On Rehearing*), 373 Mich 531, 541; 130 NW2d 4 (1964).  We do not reach this issue today because we conclude that there are no material factual disputes affecting the serious impairment threshold determination in this case.  Notably, however, the division of questions of law and fact between a judge and a jury is based on longstanding procedural rules, see *Mawich v Elsey*, 47 Mich 10, 15-16; 10 NW 57 (1881), that are intended to promote judicial efficiency.  See *Moll v Abbott Laboratories*, 444 Mich 1, 26-28; 506 NW2d 816 (1993).  Whether MCL 500.3135(2)(a) serves a purpose other than judicial dispatch is not clear, as the Legislature itself stated that the 1995 amendments were intended, in part, "to prescribe certain procedures for maintaining [tort liability arising out of certain accidents]."  See the title of 1995 PA 222.  And, of course, the scope of the rules governing summary disposition are also supported—if not compelled—by the right to a jury trial in civil cases.  See, generally, *Conservation Dep't v Brown*, 335 Mich 343, 346-347; 55 NW2d 859 (1952), and *Dunn v Dunn*, 11 Mich 284, 286 (1863).  Accord *Byrd v Blue Ridge Rural Electric Coop, Inc*, 356 US 525, 537-538; 78 S Ct 893; 2 L Ed 2d 953 (1958).  Interestingly, the dissent states that it disagrees with the majority that there could be a conflict between the statute and the court rule, but it also approvingly quotes *DiFranco* for the proposition that reasonable minds can often differ over the threshold issues in these cases.

[8] This plain reading of the statute is not necessarily inconsistent with the *Kreiner* majority's interpretation of MCL 500.3135(2)(a), see *Kreiner*, 471 Mich at 131-132, but neither the majority nor dissent in *Kreiner* discussed the constitutionality of this

---

11

fact does not need to be outcome determinative in order to be material, but it should be "significant or essential to the issue or matter at hand." Black's Law Dictionary (8th ed) (defining "material fact").

## 2. A "SERIOUS IMPAIRMENT OF BODY FUNCTION" UNDER MCL 500.3135(1) AND (7)

In those cases where the court may decide whether the serious impairment threshold is met as a matter of law, the next issue is the proper interpretation of MCL 500.3135(7). It provides that, for purposes of the section, a "serious impairment of body function" is "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." On its face, the statutory language provides three prongs that are necessary to establish a "serious impairment of body function": (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life.[9]

Overall, because we conclude that each of these prongs' meaning is clear from the plain and unambiguous statutory language, judicial construction is neither required nor

---

provision. As noted in footnote 7 of this opinion, however, the manner in which *Kreiner* interpreted the statute may be unconstitutional to the extent that it requires a court to usurp the role of the fact-finder. That issue is not presented on the facts of this case, however.

[9] The *Kreiner* majority first addressed whether the impaired body function was important and then analyzed whether the impairment was objectively manifested. 471 Mich at 132-133. We find it more consistent with the statutory text to first address the objectively manifested impairment requirement.

permitted. *In re MCI*, 460 Mich at 411. Notably, however, a dictionary may aid the Court in giving the words and phrases in MCL 500.3135(7) their common meaning, and where the language used in MCL 500.3135(7) was originally adopted and interpreted in *Cassidy* and *DiFranco*, it may be presumed that the Legislature intended the previous judicial interpretation to be relevant. *Oakland Co Bd of Rd Comm'rs*, 456 Mich at 604, and *Wright*, 432 Mich at 92. As will be discussed within, where the *Kreiner* majority's interpretation of these prongs is inconsistent with the clear language of the statute, we hold that *Kreiner* was wrongly decided. Most significantly, its interpretation of the third prong deviates dramatically from the statute's text.

## a. AN OBJECTIVELY MANIFESTED IMPAIRMENT

Under the first prong, it must be established that the injured person has suffered an objectively manifested impairment of body function. The common meaning of "an objectively manifested impairment" is apparent from the unambiguous statutory language, with aid from a dictionary, and is consistent with the judicial interpretation of "objectively manifested" in *Cassidy* and *DiFranco*. To the extent that the *Kreiner* majority's interpretation of this prong differs from this approach, it was wrongly decided.

To begin with, the adverb "objectively" is defined as "in an objective manner," *Webster's Third New International Dictionary* (1966)*,* and the adjective "objective" is defined as "1. Of or having to do with a material object as distinguished from a mental concept. 2. Having actual existence or reality. 3. a. Uninfluenced by emotion, surmise, or personal prejudice. b. Based on observable phenomena; presented factually . . . ." *The American Heritage Dictionary*, *Second College Edition* (1982). It is defined specifically

13

in the medical context as "[i]ndicating a symptom or condition perceived as a sign of disease by someone other than the person afflicted." *Id.*[10] The verb "manifest" is defined as "1. To show or demonstrate plainly; reveal.  2. To be evidence of; prove." *Id.*  Overall, these definitions suggest that the common meaning of "objectively manifested" in MCL 500.3135(7) is an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function.   In other words, an "objectively manifested" impairment is commonly understood as one observable or perceivable from actual symptoms or conditions.

Notably, MCL 500.3135(7) does not contain the word "injury," and, under the plain language of the statute, the proper inquiry is whether the *impairment* is objectively manifested, not the *injury* or its symptoms.[11]  This distinction is important because "injury" and "impairment" have different meanings.  An "injury" is "1. Damage of or to a person . . .  2. A wound or other specific damage." *The American Heritage Dictionary*,

---

[10] See also *Webster's Third New International Dictionary* (1966), defining "objective," in relevant part, as "publicly or intersubjectively observable or verifiable especially by scientific methods:  independent of what is personal or private in our apprehension and feelings: of such nature that rational minds agree in holding it real or true or valid."  It also defines "objective" in the context "of a symptom of disease" as "perceptible to persons other than an affected individual." *Id.* (italics omitted).

[11] Accordingly, the Court of Appeals decisions that have gone beyond the plain language of the statute and imposed an extra-textual "objectively manifested *injury*" requirement, in clear contravention of Legislative intent, are overruled to the extent that they are inconsistent with this opinion.  See, e.g., *Netter v Bowman*, 272 Mich App 289, 305; 725 NW2d 353 (2006) (holding that "the current meaning of 'objectively manifested' . . . requires that a plaintiff's injury must be capable of objective verification".

*Second College Edition* (1982). "Impairment" is the "state of being impaired," *Webster's Third New International Dictionary* (1966), and to be "impaired" means being "weakened, diminished, or damaged" or "functioning poorly or inadequately." *Random House Webster's Unabridged Dictionary* (1998). These definitions show that while an injury is the actual damage or wound, an impairment generally relates to the effect of that damage. Accordingly, when considering an "impairment," the focus "is not on the injuries themselves, but how the injuries affected a particular body function." *DiFranco*, 427 Mich at 67.

Further, the pre-existing judicial interpretation of "objectively manifested" is consistent with the plain language of the later-adopted statute. In *Cassidy*, this Court explained that the serious impairment threshold was not met by pain and suffering alone, but also required "injuries that affect the functioning of the body," i.e., "objectively manifested injuries." *Cassidy*, 415 Mich at 505. In other words, *Cassidy* defined "objectively manifested" to mean affecting the functioning of the body.[12] *DiFranco* affirmed this and further explained that the "objectively manifested" requirement signifies that plaintiffs must "introduce evidence establishing that there is a physical basis for their subjective complaints of pain and suffering" and that showing an impairment generally requires medical testimony. *DiFranco*, 427 Mich at 74.

---

[12] Although the Legislature plainly rejected that it is the *injury* that should be objectively manifested, as opposed to the *impairment*, the previous judicial construction of "objectively manifested" is still relevant.

The *Kreiner* majority's interpretation of this language was only partially consistent with the plain language of the statute. It addressed this issue briefly, stating that "[s]ubjective complaints that are not medically documented are insufficient [to establish that an impairment is objectively manifested]." *Kreiner*, 471 Mich at 132. To the extent that this is inconsistent with *DiFranco*'s statement that medical *testimony* will *generally* be required to establish an impairment, it is at odds with the legislative intent expressed by the adoption of the "objectively manifested" language from *DiFranco* and *Cassidy*. Thus, to the extent that *Kreiner* could be read to *always* require medical documentation, it goes beyond the legislative intent expressed in the plain statutory text, and was wrongly decided.

### b. OF AN IMPORTANT BODY FUNCTION

If there is an objectively manifested impairment of body function, the next question is whether the impaired body function is "important." The common meaning of this phrase is expressed in the unambiguous statutory language, although reference to a dictionary and limited reference to *Cassidy* is helpful.

The relevant definition of the adjective "important" is "[m]arked by or having great value, significance, or consequence." *The American Heritage Dictionary*, *Second College Edition* (1982). See also *Random House Webster's Unabridged Dictionary* (1998), defining "important" in relevant part as "of much or great significance or consequence," "mattering much," or "prominent or large." Whether a body function has great "value," "significance," or "consequence" will vary depending on the person. Therefore, this prong is an inherently subjective inquiry that must be decided on a case-

16

by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life.

The "important body function" language was originally adopted in *Cassidy*, where the Court stated that an "important" body function is not *any* body function but also does not refer to the *entire* body function. *Cassidy*, 415 Mich at 504. This pre-existing judicial construction of "important body function" is consistent with the common meaning of "important."[13]

For this prong, the *Kreiner* majority's interpretation appears to be consistent with the plain language of the statute, as it only briefly stated that "[i]t is insufficient if the impairment is of an unimportant body function." *Kreiner*, 471 Mich at 132.[14] If, however, the *Kreiner* majority's position has been construed in a manner that is inconsistent with this opinion, then we disapprove of those constructions.

---

[13] *Cassidy* also held that the importance of a body function is an *objective* standard based on its effect on "the person's general ability to live *a* normal life." *Cassidy*, 415 Mich at 505 (emphasis added). As discussed below, however, the Legislature specifically rejected the idea that the normal life evaluation should be objective, and, thus, implicitly rejected *Cassidy*'s determination that whether a body function is "important" could be objectively determined outside the context of the person's actual life. Notably, *DiFranco* is inapposite because it rejected the "important body function" test. *DiFranco*, 427 Mich at 61-62.

[14] The *Kreiner* majority also apparently agreed that this is a subjective, case-by-case inquiry. *Kreiner*, 471 Mich at 134 n 19.

17

## c. THAT AFFECTS THE PERSON'S GENERAL ABILITY
## TO LEAD HIS OR HER NORMAL LIFE

Finally, if the injured person has suffered an objectively manifested impairment of body function, and that body function is important to that person, then the court must determine whether the impairment "affects the person's general ability to lead his or her normal life."  The common meaning of this phrase is expressed by the unambiguous statutory language, and its interpretation is aided by reference to a dictionary, reading the phrase within its statutory context, and limited reference to *Cassidy*.

To begin with, the verb "affect" is defined as "[t]o have an influence on; bring about a change in." *The American Heritage Dictionary*, *Second College Edition* (1982).  An "ability" is "[t]he quality of being able to do something," *id.*, and "able" is defined as "having sufficient power, skill, or resources to accomplish an object."  *Merriam-Webster Online Dictionary*, <http://www.merriam-webster.com> (accessed May 27, 2010).  The adjective "general" means:

> 1. Relating to, concerned with, or applicable to the whole or every member of a class or category.  2. Affecting or characteristic of the majority of those involved; prevalent: *a general discontent*.  3. Being usually the case; true or applicable in most instances but not all.  4. a. Not limited in scope, area, or application: *as a general rule.*  b. Not limited to one class of things: *general studies*.  5. Involving only the main features of something rather than details or particulars.  6. Highest or superior in rank."  [*The American Heritage Dictionary*, *Second College Edition* (1982).]

The sixth definition is obviously irrelevant, and the first definition of "general" does not make sense in this context because a person's "whole" ability to live his or her normal life is surely not affected short of complete physical and mental incapacitation, which is accounted for in a different statutory threshold: death.  The other definitions, however,

more or less convey the same meaning: that "general" does not refer to only one specific detail or particular part of a thing, but, at least some parts of it. Thus, these definitions illustrate that to "affect" the person's "general ability" to lead his or her normal life is to influence some of the person's power or skill, i.e., the person's capacity, to lead a normal life.

The next question is the meaning of "to lead his or her normal life." The verb "lead," in this context, is best defined as "[t]o pass or go through; live." *The American Heritage Dictionary*, *Second College Edition* (1982). Although the verb "lead" has many definitions, some of which have similar nuances, this definition is the most relevant because it expressly applies in the context of leading a certain type of life. Indeed, other dictionaries provide a similar definition with the same context, using a "type of life" as an example.[15] Similarly, "life" has multiple meanings, but one specifically references the context of leading a particular type of life, which is "[a] manner of living: *led a good life*." *Id.* Other definitions are similar, such as "[t]he physical, mental, and spiritual experiences that constitute a person's existence," or "[h]uman existence or activity in general." *Id.* Given the contextual examples used in the dictionary, the common understanding of "to lead his or her normal life" is to live, or pass life, in his or her normal manner of living.

---

[15] See *Random House Webster's Unabridged Dictionary* (1998), defining "lead" as "to go through or pass (time, life, etc.): *to lead a full life*," and *Webster's Third New International Dictionary* (1966), defining it as "to go through (life or some other period of time): PASS, LIVE <there he *led* a very peaceful existence>."

19

Therefore, the plain text of the statute and these definitions demonstrate that the common understanding of to "affect the person's ability to lead his or her normal life" is to have an influence on some of the person's capacity to live in his or her normal manner of living. By modifying "normal life" with "his or her," the Legislature indicated that this requires a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis. Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident.

There are several important points to note, however, with regard to this comparison. First, the statute merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed. Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected.

Second, and relatedly, "general" modifies "*ability,*" not "affect" or "normal life." Thus, the plain language of the statute only requires that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected. Thus, while the extent to which a person's general ability to live his or her normal life is affected by an impairment is undoubtedly related to what the person's normal manner of living is, there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected.

20

Third, and finally, the statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on "the person's general ability to live his or her normal life." To begin with, there is no such requirement in the plain language of the statute. Further, MCL 500.3135(1) provides that the threshold for liability is met "if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." While the Legislature required that a "serious disfigurement" be "permanent," it did not impose the same restriction on a "serious impairment of body function." Finally, to the extent that this prong's language reflects a legislative intent to adopt this portion of *Cassidy* in some measure,[16] *Cassidy* expressly rejected a requirement of permanency to meet the serious impairment threshold. *Cassidy*, 415 Mich at 505-506 (noting that "two broken bones, 18 days of hospitalization, 7 months of wearing casts during which dizzy spells further affected his mobility, and at least a minor residual effect one and one-half years later are sufficiently serious to meet the threshold requirement of serious impairment of body function").

Despite the fact that the language of the statute was plain, the *Kreiner* majority deviated significantly from the statutory text in its interpretation of this prong. To begin with, the *Kreiner* majority erred in its interpretation of the phrase "that affects the person's general ability" for two reasons. First, it selectively quoted only the dictionary

---

[16] Although some of this prong's text is derived from *Cassidy,* the Legislature made important modifications. The *Cassidy* Court stated that the serious impairment threshold "looks to the effect of an injury on the person's general ability to live a normal life," *Cassidy*, 415 Mich at 505, and the Legislature rejected that the standard for "a" normal life was objective.

definitions of "general" that best supported its conclusions. It gave one definition for this word, "'the whole; the total; that which comprehends or relates to all, or the chief part; a general proposition, fact, principle, etc.;—opposed to particular; that is, opposed to special,'" and then relied on definitions of "in general" and "generally" to conclude that "general" means "'for the most part.'" *Kreiner*, 471 Mich at 130, quoting *Webster's New International Dictionary*. *Webster's*, however, offers *10* definitions of the adjective "general," many of which are similar to definitions quoted above from *The American Heritage Dictionary*. Moreover, of these 10 definitions, the majority chose the most restrictive, even though, as discussed above, it does not make the most sense in this context. And, even then, the *Kreiner* majority looked to other forms of the word. Second, the *Kreiner* majority stated that "[t]he starting point in analyzing whether an impairment affects a person's 'general,' i.e., overall, ability to lead his normal life should be identifying how his life has been affected, by how much, and for how long." *Kreiner*, 471 Mich at 131. Although other portions of the *Kreiner* majority opinion more carefully stated that the test was the effect on a person's general ability, this particular reasoning could be pulled out of context to suggest that courts should focus on how much the impairment affects a person's *life*, instead of how much it affects the person's *ability* to live his or her life.

Further, the *Kreiner* majority significantly erred in its interpretation of "to lead his or her normal life." It relied on a dictionary to define "lead" as "to conduct or bring in a particular course." Notably, depending on how this definition is interpreted, it may have a similar meaning to "live" or "pass" when "conduct" and "course" are given a certain

22

meaning. "Conduct" can mean "to behave or act," and "course" can mean "[a] mode of action or behavior" or "[a] typical or natural manner of proceeding or developing: customary passage . . . ." *The American Heritage Dictionary*, *Second College Edition* (1982). The meaning of "to behave or act in his or her typical or natural manner of proceeding" may be similar to "living in his or her normal manner of living."

Beyond this point, however, the *Kreiner* majority went astray and gave the statute a labored interpretation inconsistent with common meanings and common sense. Applying its chosen definition of "lead," the majority concluded that "the effect of the impairment on the course of a plaintiff's entire normal life must be considered," and if "the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's 'general ability' to lead his normal life has not been affected . . . ." *Kreiner*, 471 Mich at 131. In other words, the *Kreiner* majority held that the "common meaning" of whether an impairment has affected "the person's general ability to lead his or her normal life" is whether it has affected the person's general ability to conduct the course or trajectory of his or her entire normal life. This "common meaning" is quite different from the actual statutory text in form and substance. Significantly, the *Kreiner* majority's interpretation of the statute interjects two terms that are not included in the statute *or* the dictionary definitions of the relevant statutory language: "*trajectory*" and "*entire*." Both terms create ambiguity where the original statutory text had none, and the *Kreiner* majority thus erred by selectively defining the words used in definitions of statutory terms in order to shift away from the common meaning that the words have in the context of MCL 500.3135(7).

23

As to the first addition, while "trajectory" is a synonym for "course" when "course" is defined as, for example, "[t]he direction of continuing movement," *The American Heritage Dictionary, Second College Edition* (1982), it is not a synonym for the definition of "course" that makes sense in the context of defining a "general ability to lead his or her normal life." When "conduct" is used with this definition of "course," it has the very different meaning of "[t]o direct the course of; control." *Id.* The plain language of the statute does not suggest that the Legislature's intent was to address the effect of an impairment on the person's ability to control the direction of their life, as opposed to its effect on the person's ability to live in his or her normal manner of living. Yet the majority managed to imply this meaning by inserting "trajectory" as a synonym for "course," thereby shifting the meaning of "course" from the most natural contextual reading of the word. The use of "trajectory" and the suggestion that "course" should be understood to mean "the direction of continuing movement," instead of "a mode of action or behavior," creates ambiguity by implying a sense of permanence that is inconsistent with, and does not make sense in the context of, the actual statutory language.

As to the second addition, the majority modified the statutory language "his or her normal life" with "entire," a modification that it apparently created out of thin air,[17] thereby creating an ambiguity that had not previously existed in the statutory text. The

_____

[17] The *Kreiner* majority did define "in general" as "with respect to the entirety" when interpreting "general ability." *Kreiner*, 471 Mich at 130. But, even assuming that it is proper to use the definition of the phrase "in general" to define the adjective "general," the Legislature used general to modify *ability*, not life.

24

word "life" has more than one meaning. As noted, it can refer to the meaning that would be commonly understood to apply in the context of the statutory language, which is "a manner of living." It also can refer to "[t]he interval of time between birth and death; lifetime." *The American Heritage Dictionary*, *Second College Edition* (1982). The differences are significant: whereas the first meaning refers to the day-to-day process of living, the second is a finite measure that encompasses all of one's time on earth. Although "entire" could modify either meaning of "life," it is probably more commonly used to modify the second. Thus, by inserting "entire," the *Kreiner* majority created an ambiguity that is not present in the original statutory text because the second, finite definition of "life" does not make sense in the context of the actual statutory language. It would be unusual to refer to someone's general ability to lead his or her normal "lifetime" or "interval of time between life and death." At best, this would seem to refer to an effect on the person's life expectancy, but this would not be a subjective inquiry, and it is an impossible leap from any common understanding of the statutory language.[18] At a minimum, using the modifier "entire" reinforces the general sense of permanence that is also created by the insertion of "trajectory," but which, as explained, is not in the actual statutory text. Because the *Kreiner* majority created ambiguity where there was none, and crafted a statutory interpretation that is, in effect, a judicially constructed house of cards, we hold that it incorrectly interpreted the third prong of MCL 500.3135(7).

---

[18] It is also to some extent accounted for in another threshold in MCL 500.3135(1): death.

25

The *Kreiner* majority aggravated this error, and departed even more dramatically from the statutory text, by providing an extra-textual "nonexhaustive list of objective factors" to be used to compare the plaintiff's pre- and post-incident lifestyle. These factors are: "(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery." *Kreiner*, 471 Mich at 133.[19] The Legislature has unambiguously defined the "serious impairment of body function," and the role of this Court is to apply the plain language of that definition, not to improve it with a list of judicially created factors that are not necessarily based in the statute's text. In fact, at least some of the *Kreiner* majority's factors have no basis in the statutory text and are instead derived from its extra-textual and extra-definitional additions to the actual statutory language, "entire" and "trajectory," and serve to reinforce the ambiguity that its interpretation of the third prong created, especially given that all of the factors expressly or impliedly include a temporal component. Because the factors adopted by the *Kreiner* majority are not based in the statutory text, and this Court's role is to apply the

---

[19] The majority correctly observes that I do not object to courts employing factors when applying statutes in many circumstances. I certainly object, however, to courts doing so in a manner that not only perverts the statutory language but is also unsupported by, and inconsistent with, the legislative intent expressed by the statutory language, as the *Kreiner* majority did.

unambiguous statutory language, not improve it, we hold that the majority erred by adopting them.[20]

In summary, the *Kreiner* majority's interpretation of the third prong departed from the idea that a court "should not casually read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute." *Kreiner*, 471 Mich at 157 (CAVANAGH, J., dissenting). Indeed, as I remarked in dissent, the *Kreiner* majority's "interpretation" of the plain language of MCL 500.3135(7) was a "chilling reminder that activism comes in all guises, including so-called textualism." *Kreiner*, 471 Mich at 157. Therefore, we hold that the *Kreiner* majority's interpretation of this prong, including the list of non-exhaustive factors, is not based in the statute's text and is incorrect.

---

[20] Indeed, the potential for the *Kreiner* majority's interpretation to be read in a manner that is inconsistent with the statute has been realized in lower court decisions. For example, in *Gagne v Schulte*, unpublished opinion per curiam of the Court of Appeals, issued February 28, 2006 (Docket No. 264788), the Court of Appeals held that a plaintiff had not suffered a serious impairment of body function even though her knee injury resulted in surgery and severe restrictions on her movement for a year after the accident, indefinite continuing restrictions on her ability to perform her pre-accident job and other activities in which she participated before the accident, and a permanent loss of stability in her knee and an increased risk of osteoarthritis. The majority reasoned that these impairments were insufficient to meet the threshold because she might someday be able to resume some activities with a knee brace and "there is no evidence that this period of decreased function affected her life so extensively that it altered the trajectory or course of her entire normal life." *Id.*, unpub op at 2. Indeed, the majority's reasoning seemed to consider whether the plaintiff's ability to control the direction of her entire life had been altered, rather than her ability to live her life in a normal manner, given that it found the threshold was not met despite evidence that the plaintiff had continuing restrictions on movement, activities, and work, and medically documented long-term damage.

### 3. STARE DECISIS: SHOULD *KREINER* BE OVERRULED?

To the extent that the *Kreiner* majority's interpretation of the statute was inconsistent with the foregoing approach, and departed from the legislative intent expressed in the unambiguous language of the statute, we hold that it was wrongly decided. Given this conclusion, the question is whether it should be overruled. We hold that it should be.[21]

Under the doctrine of stare decisis, "principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed." *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365; 550 NW2d 215 (1996) (citations and quotation marks omitted). Indeed, in order to "'avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them . . . .'" *Petersen v Magna Corp*, 484 Mich 300, 314-315; 773 NW2d

---

[21] The dissenters' stare decisis protestations should taste like ashes in their mouths. To the principles of stare decisis, to which they paid absolutely no heed as they denigrated the wisdom of innumerable predecessors, the dissenters now would wrap themselves in its benefits to save their recent precedent.

Ironically, the very doctrine and approach that the dissent vehemently claims to adhere to today, from *Robinson v Detroit,* 462 Mich 439; 613 NW2d 307 (2000), was not so faithfully applied by the members of the dissent in the past. Indeed, the members of the dissent have overruled caselaw without even paying lip service to *Robinson*, see, e.g., *People v Anstey*, 476 Mich 436; 719 NW2d 579 (2006), or after engaging in a cursory or limited analysis of the factors that they claim fidelity to today. See, e.g., *Wesche v Mecosta Co Rd Comm*, 480 Mich 75, 91 n 13 (2008); *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280, 297 n 10; 731 NW2d 29 (2007); *Neal v Wilkes*, 470 Mich 661, 667 n 8; 685 NW2d 648 (2004); *People v Hickman*, 470 Mich 602, 610 n 6; 684 NW2d 267 (2004); *Mack v Detroit*, 467 Mich 186, 203 n 19; 649 NW2d 47 (2002).

564 (2009) (opinion by KELLY, C.J.), quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961). As the United States Supreme Court has stated, the doctrine "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v Tennessee*, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991).

Despite its importance, stare decisis is neither an "inexorable command," *Lawrence v Texas*, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003), nor "a mechanical formula of adherence to the latest decision . . . ." *Helvering v Hallock*, 309 US 106, 119; 60 S Ct 444; 84 L Ed 604 (1940). Ultimately, it is an attempt "to balance two competing considerations: the need of the community for stability in legal rules and decisions and the need of courts to correct past errors." *Petersen*, 484 Mich at 314. As a reflection of this balance, there is a presumption in favor of upholding precedent, but this presumption may be rebutted if there is a special or compelling justification to overturn precedent. *Id.* at 319-320. In determining whether a special or compelling justification exists, a number of evaluative criteria may be relevant, *id.*, but overturning precedent requires more than a mere belief that a case was wrongly decided. See *Brown*, 452 Mich at 365.[22]

---

[22] In *Petersen*, Chief Justice KELLY provided a non-exhaustive list of criteria that may be considered, but none of the criteria is determinative, and they need only be evaluated if relevant. See *Petersen*, 484 Mich at 320.

In determining whether *Kreiner* should be overruled, I find several evaluative criteria particularly relevant: (1) "whether the rule has proven to be intolerable because it defies practical workability," (2) "whether reliance on the rule is such that overruling it would cause a special hardship and inequity," (3) "whether upholding the rule is likely to result in serious detriment prejudicial to public interests," and (4) "whether the prior decision was an abrupt and largely unexplained departure from precedent." *Petersen*, 484 Mich at 320. As applied here, on the balance, these criteria weigh in favor of overturning *Kreiner*.

The first criterion weighs heavily in favor of overruling *Kreiner* because the *Kreiner* majority's departure from the plain language of MCL 500.3135(7) defies practical workability. As discussed above, the majority took unambiguous statutory text and, through linguistic gymnastics, contorted it into a confusing and ambiguous test. Appellate litigation arising out of MCL 500.3135(7) has greatly increased since *Kreiner*[23] and has resulted in confusion. To begin with, the lower courts' application of *Kreiner* has led to inconsistent interpretation of the statutory language, with similarly situated

---

[23] In the six years since *Kreiner* was decided, there have been *three times* as many Court of Appeals cases citing MCL 500.3135(7) as there were in the nine years between when the amendment was enacted and *Kreiner* was decided. In the nine years between when the amendment became effective and when *Kreiner* was decided, only 86 Court of Appeals cases cited MCL 500.3135(7). As of May 27, 2010, in the six years since the *Kreiner* decision was issued, there have been *254* Court of Appeals cases citing MCL 500.3135(7).

30

plaintiffs being treated differently by different courts.[24]  Further, some courts have

interpreted *Kreiner* to create a threshold that is higher than that in *Cassidy* or *DiFranco*,

primarily by reading the *Kreiner* majority's interpretation of the statute to effectively

create a permanency requirement.[25]  As discussed, this is contrary to the legislative intent

expressed by the plain language of the statute.  Because the *Kreiner* majority's

interpretation of the third prong of MCL 500.3135(7) has created ambiguity where there

was none, and increased litigation and confusion, the first factor weighs heavily in favor

of overruling *Kreiner*.

Second, correcting the errors in the *Kreiner* majority's interpretation of MCL

500.3135(7) would not present an undue hardship to reliance interests, and this factor

weighs in favor of overruling *Kreiner*.  As this Court has explained when evaluating a

similar factor in the past, "the Court must ask whether the previous decision has become

---

[24] For example, in *Luther v Morris*, unpublished opinion per curiam of the Court of Appeals, issued January 18, 2005 (Docket No. 244483), the Court held that the plaintiff had suffered a serious impairment of body function where a dislocated elbow caused her to miss 52 days of work and significantly interfered with her ability to perform daily personal tasks for a while, but her life returned to normal within a couple of months after the accident.  In contrast, in *Guevara v Martinez*, unpublished opinion per curiam of the Court of Appeals, issued May 24, 2005 (Docket No. 260387), the Court held that there was no serious impairment where the plaintiff suffered a dislocated right shoulder and a torn anterior rotator cuff that significantly interfered with his ability to perform daily personal tasks for a couple of months and prevented him from continuing work as a part-time construction worker during at least the surgery and multiple months of rehabilitation.  The outcomes in these cases are difficult to reconcile.

[25] See footnote 20 of this opinion summarizing *Gagne v Schulte*, unpublished opinion per curiam of the Court of Appeals, issued February 28, 2006 (Docket No. 264788).

31

so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson v Detroit*, 462 Mich 439, 466; 613 NW2d 307 (2000). It further stated that this factor applies to cases that if overruled "even if they were wrongfully decided, would produce chaos." *Id.* at 466 n 26. *Kreiner* is not "so" embedded, accepted, or fundamental to expectations that chaos will result from overruling it. To begin with, *Kreiner* was decided only six years ago, and, while it was the first opinion from this Court interpreting MCL 500.3135(7), it was contrary to the plain text of the statute, which had been in place since 1995. As the *Robinson* majority explained, people normally rely on the words of the statute itself when looking for guidance on how to direct their actions. *Robinson*, 462 Mich at 467. Further, it is unlikely that motor vehicle drivers, and the victims of motor vehicle accidents, have altered their behavior in reliance on *Kreiner*. As noted by the *Robinson* majority, where a statute deals with the consequences of accidents, "it seems incontrovertible that only after the accident would . . . awareness [of this Court's caselaw] come," and "after-the-fact awareness does not rise to the level of a reliance interest because to have reliance the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event." *Id*. at 466-467. Similarly, this statute generally involves motor vehicle accidents, and it strains credibility to think that the average driver and the average future injured party have altered their behavior in reliance on *Kreiner*.

The third criterion, the effect on the public interest, also weighs in favor of overruling *Kreiner*. Although there may be policy arguments on both sides regarding the

32

costs and benefits of having a more or less difficult threshold for recovery under MCL 500.3135, our interpretation of the statute in this case is truer to the statute's text than that of the *Kreiner* majority, and, thus, our interpretation most closely reflects the policy balance struck by the Legislature.[26]  In contrast, *Kreiner* altered the balance from that intended by the Legislature by imposing extra-textual burdens to meeting the threshold, and, as a result, it is difficult to argue that overruling *Kreiner* to restore the balance intended by the Legislature would hurt the public interest (or that affirming *Kreiner* serves it).

Finally, the fourth criterion is neutral.  *Kreiner* was not an abrupt change from precedent, but it did provide an interpretation of the statute that was not obvious from the statute's text.

On the basis of these evaluative criteria, we hold that *Kreiner* should be overruled.

### 4. SUMMARY OF LEGISLATIVE TEST

On the basis of the foregoing, the proper interpretation of the clear and unambiguous language in MCL 500.3135 creates the following test.

---

[26] The dissent devotes a significant amount of time conducting what is essentially a policy analysis hypothesizing about the disastrous effects that this opinion will have on the insurance industry and, thus, concluding that we are undoing the legislative compromise that was the general backdrop of the no-fault act.  While I am cognizant of the legislative compromise, I am less convinced than the dissent that this Court's role is to conduct an independent policy analysis to determine whether the plain language of an amendment adopted by the Legislature, 20 years after the no-fault act was originally adopted, is inconsistent with the overall act's general purposes.  Even assuming arguendo that it could be, I do not believe that broad statements regarding the general purpose of the act's adoption in 1973 trump the intent expressed by the Legislature in the plain language of a later amendment to the act.

To begin with, the court should determine whether there is a factual dispute regarding the nature and the extent of the person's injuries, and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met. MCL 500.3135(2)(a)(*i*) and (*ii*).[27] If there is no factual dispute, or no material factual dispute, then whether the threshold is met is a question of law for the court. *Id*.

If the court may decide the issue as a matter of law, it should next determine whether the serious impairment threshold has been crossed. The unambiguous language of MCL 500.3135(7) provides three prongs that are necessary to establish a "serious impairment of body function": (1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living).

The serious impairment analysis is inherently fact- and circumstance- specific and must be conducted on a case-by-case basis. As stated in the *Kreiner* dissent, "[t]he Legislature recognized that what is important to one is not important to all[;] a brief impairment may be devastating whereas a near permanent impairment may have little

---

[27] As discussed in footnotes 7 and 8 of this opinion, this provision may unconstitutionally conflict with MCR 2.116(C)(10) in certain cases. If it does, then a court should only apply MCL 500.3135(2) to the extent that it is consistent with MCR 2.116(C)(10). We do not reach this issue today, however, because there is no material factual dispute over any fact necessary to determining whether the serious impairment threshold has been met.

34

effect." *Kreiner*, 471 Mich at 145 (CAVANAGH, J., dissenting). As such, the analysis does not "lend itself to any bright-line rule or imposition of [a] nonexhaustive list of factors," particularly where there is no basis in the statute for such factors. *Id.* Accordingly, because "[t]he Legislature avoided drawing lines in the sand . . . so must we." *Id.*

## C. APPLICATION OF MCL 500.3135

Under the facts of this case, we hold that plaintiff has met the serious impairment threshold as a matter of law.

To begin with, there is no factual dispute that is material to determining whether the serious impairment threshold is met. The parties do not dispute that plaintiff suffered a broken ankle, was completely restricted from bearing weight on his ankle for a month, and underwent two surgeries over a 10-month period and multiple months of physical therapy. The parties do dispute the extent to which plaintiff continues to suffer a residual impairment and the potential for increased susceptibility to degenerative arthritis. Plaintiff has provided at least some evidence of a physical basis for his subjective complaints of pain and suffering,[28] but defendant disputes whether there is persuasive evidence of impairment beyond plaintiff's subjective complaints. This dispute is not significant or essential to determining whether the serious impairment threshold is met in this case, however, because plaintiff has not alleged that the residual impairment, to the

---

[28] The FCEs report that plaintiff's range of motion in his ankle is not within normal limits, and the MRI and two doctors' reports suggest at least some scarring and degenerative tissue damage around plaintiff's left ankle.

35

extent that it exists, continues to affect his general ability to lead his pre-incident "normal life,"[29] the third prong of the analysis. Moreover, it is not necessary to establish the first two prongs. Therefore, the dispute is not material and does not prevent this Court from deciding whether the threshold is met as a matter of law under MCL 500.3135(2)(a).

The other facts material to determining whether the serious impairment threshold is met are also undisputed.[30] Before the incident, plaintiff's "normal life" consisted primarily of working 60 hours a week as a medium truck loader. Plaintiff also frequently fished in the spring and summer and was a weekend golfer. After the incident, plaintiff was unable to return to work for at least 14 months and did not return for 19 months. He never returned to his original job as a medium truck loader, but he suffered no loss in pay because of the change in job. He was able to fish at pre-incident levels by the spring of 2006 and is able to take care of his personal needs at the same level as before the incident. There is no allegation that the impairment of body function has affected his relationship with his significant other or other qualitative aspects of his life.

Next, in light of the lack of a factual dispute that is material to determining whether the threshold is met, under MCL 500.3135(2)(a), this Court should decide as a

---

[29] Plaintiff stated that his life is "painful, but normal." He does not allege that any residual impairment has a significant effect on his ability to participate in or enjoy activities to the extent that he could before the accident.

[30] If there had been other disputed facts that were material to this determination, we would have to reach the question whether MCL 500.3135(2)(a) is unconstitutional to the extent that it requires a court to decide material disputed facts as a matter of law. See footnote 7 of this opinion.

matter of law whether plaintiff suffered a serious impairment of body function under the three prongs in MCL 500.3135(7).

With regard to the first prong, plaintiff has shown an objectively manifested impairment of body function. There is no dispute that plaintiff has presented evidence that he suffered a broken ankle and actual symptoms or conditions that someone else would perceive as impairing body functions, such as walking, crouching, climbing, and lifting weight. Even 14 months after the incident, an FCE report observed that ankle pain and a reduced range of motion inhibited these body functions. Thus, plaintiff has satisfied this prong.

With regard to the second prong, the impaired body functions were important to plaintiff. His testimony establishes that being unable to walk and perform other functions were of consequence to his ability to work. Thus, the second prong of MCL 500.3135(7) is met.

The next question in this case is whether the third prong is met, but we hold that plaintiff has shown that the impairment affected his general ability to lead his normal life because it influenced some of his capacity to live in his normal, pre-incident manner of living. Before the incident, plaintiff's normal manner of living consisted primarily of working, for 60 hours a week, and secondarily his hobbies of fishing and golfing. After the incident, at least some of plaintiff's capacity to live in this manner was affected. Specifically, for a month after the incident, plaintiff could not bear weight on his left ankle. He underwent two surgeries over a period of 10 months and multiple months of physical therapy. Moreover, his capacity to work, the central part of his pre-incident

"normal life," was affected.[31]  Whereas before the incident he spent most of his time working, after the incident he was unable to perform functions necessary for his job for at least 14 months, and he did not return to work for 19 months.[32]  On the basis of these facts, we conclude that some of plaintiff's capacity to live in his pre-incident manner of living was affected, and the third prong of MCL 500.3135(7) is satisfied.[33]

Because all three prongs of MCL 500.3135(7) are satisfied, we hold, as a matter of law, that plaintiff has met the serious impairment threshold requirement under MCL 500.3135(1).

## D. RESPONSE TO THE DISSENT

Despite the dissent's length, it provides very little substantive disagreement or criticism of the statutory interpretation presented in this opinion and very little response to our criticisms of the statutory interpretation in *Kreiner*.  Where the dissent does actually address the substance of the opinion, its criticisms are often based not on the

---

[31] As noted, it is unclear from the record the extent to which the impairment affected plaintiff's ability to fish in the first year after the incident or his ability to golf in the first year and a half after the incident, or the extent to which he actually undertook either activity in those periods.

[32] It could be significant that plaintiff's job has changed, even though his pay is the same, but there is no evidence suggesting that this was an effect of impairment. Therefore, this fact is not relevant to the "normal life" inquiry here.

[33] Our analysis focuses on plaintiff's pre- and post-incident activities and the extent to which he was able to participate in them after the incident because those are the facts in the record.  The facts that the parties considered relevant in developing the record were, no doubt, influenced by the *Kreiner* majority's erroneous deviation from the statutory language.  As noted, however, many other considerations could typically be relevant to determining how an impairment affects a person's ability to live in his or her pre-incident normal manner of living.

*actual* holdings of the majority opinion but, instead, on the dissent's misunderstandings or overgeneralizations of those holdings.

For example, the dissent complains that the majority "resuscitate[s]" my opinion in *DiFranco*.[34] As a result, the dissent resuscitates old criticisms of *DiFranco* and attacks the majority for failing to recognize the Legislature's intent, as expressed in the statute's legislative history, to reject *DiFranco* in favor of *Cassidy*.[35] As is plainly evident in the analysis, however, this opinion faithfully applies the text of the statute, even where that text is inconsistent with *DiFranco*. The opinion fully recognizes the Legislature's adoption of *Cassidy* where the Legislature indicated an intent to do so *through the text of the statute* and "resuscitates" *DiFranco* only in the narrow places where, similarly, the statutory text indicates a legislative intent to do so.[36]

Additionally, the dissent's comments on the majority's lack of use of legislative history are ill-founded on two levels. First, contrary to the dissent's assertion that I have

---

[34] The only explanation that I can discover for the dissent's reaching this conclusion is its baseless accusation that the majority is essentially reading the third prong out of the statute. It is unclear to me, however, how reading and applying the plain text of the statute, instead of enhancing and extending the statute through creative use of a thesaurus and extra-textual factors, could equate to reading that language out of the statute.

[35] Interestingly, while criticizing the majority for supposedly reviving *DiFranco*, the dissent also criticizes us for not going far enough in its revival by not adopting the factors that I used in *DiFranco*.

[36] It appears that the dissent itself does not actually believe that we are resuscitating *DiFranco*, given that it so vigorously, albeit erroneously, argues that the only difference between our decision today and *Kreiner* is that *Kreiner* adopted temporal requirements.

"never questioned the utility of legislative history" and that "there is no principled reason" not to use it in this case, I have repeatedly stated that legislative history should only be used to interpret a statute when statutory language is ambiguous. See, e.g., *People v Gardner*, 482 Mich 41; 753 NW2d 78 (2008) (CAVANAGH, J., dissenting); *Bukowski v Detroit*, 478 Mich 268; 732 NW2d 75 (2007) (CAVANAGH, J., concurring); *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 174; 680 NW2d 840 (2004) (CAVANAGH, J., dissenting).[37] The statutory language at issue here is not ambiguous.[38]

Second, even if legislative history should be used, our application of the plain language

[37] To the extent the dissent insinuates that I have relied on legislative history to interpret an unambiguous statute, it is reaching. None of the cases that the dissent cites involves instances where I relied on legislative history to identify an ambiguity or give unambiguous text a meaning inconsistent with the plain language of the statute. In most, I merely emphasized that the legislative history *confirmed* the meaning in the unambiguous text. See, e.g., *Jackson v Green Estate*, 484 Mich 209, 230; 771 NW2d 675 (2009) (CAVANAGH, J., dissenting); *Koester v City of Novi*, 458 Mich 1, 16; 580 NW2d 835 (1998); *People v Sloan*, 450 Mich 160, 183-184; 538 NW2d 380 (1995); *Grand Trunk Western R Co v Fenton*, 439 Mich 240, 247; 482 NW2d 706 (1992).

[38] The dissent references Judge Leventhal's remark that using legislative history for statutory interpretation is the equivalent of walking into a crowded room and looking for one's friends. Similar to my approach, however, this analogy has been used by justices of the United States Supreme Court to explain why legislative history should not be used to interpret clear and *unambiguous* statutory language. See *Exxon Mobil Corp v Allapattah Servs, Inc*, 545 US 546, 568-570; 125 S Ct 2611; 162 L Ed 2d 502 (2005), using the criticism to explain that legislative history should not be used to determine whether Congress intended an otherwise unambiguous statute to overrule a court's interpretation of an earlier version of the statute because "[e]xtrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." See also *Conroy v Aniskoff*, 507 US 511, 518-519; 113 S Ct 1562; 123 L Ed 2d 229 (1993) (Scalia, J., concurring) (using the criticism to explain why the majority should have stopped its analysis after concluding that a statute was unambiguous).

of the statute is consistent with the House legislative analysis's statement that the amendments were intended to return the law to a threshold "resembling" *Cassidy*. House Legislative Analysis, HB 4341, December 18, 1995. The dissent's statements to the contrary are, again, largely based on its mistaken characterization of the majority opinion as resuscitating *DiFranco* and ignoring *Cassidy*.

The dissent also repeatedly states that the majority opinion holds that temporal considerations are "wholly or largely irrelevant" to the serious impairment threshold, and, accordingly, it spends a significant amount of energy explaining why temporal considerations are relevant and accusing the majority of holding that the threshold is met if "the plaintiff's general ability to lead his normal life has been affected for even a single moment in time." Contrary to the dissent's cries, there is simply no basis in our analysis for concluding that we hold that temporal considerations are irrelevant or that a momentary impairment is sufficient. The opinion merely notes that there is no specific *express* temporal requirement in the text of the statute and rejects *Kreiner*'s strained attempts to insert what was essentially a permanency requirement into the statute.[39] The dissent's mistaken characterizations of this opinion amount to nothing more than, like *Kreiner* itself, yet another attempt to distract courts and parties from the *actual* text of MCL 500.3135.

---

[39] Indeed, the dissent is so blindly intent on concluding that the majority must be rejecting temporal considerations that it fails to consider that its triumphant discovery of the majority's "hypocrisy" in referencing time periods in our application of MCL 500.3135(2) is nothing more than a reflection of the fact that we are *not* holding that temporal considerations are irrelevant.

41

## IV. CONCLUSION

We hold that *Kreiner* should be overruled because the *Kreiner* majority's interpretation of MCL 500.3135 departed from the statute's clear and unambiguous text. Applying the unambiguous statutory language, we hold that as a question of law, in this case, plaintiff established that he suffered a serious impairment of body function. Thus, we reverse the Court of Appeals and remand the case to the trial court for proceedings consistent with this opinion.

KELLY, C.J., and WEAVER (except for the part entitled "Stare Decisis"), and HATHAWAY, JJ., concurred with CAVANAGH, J.

STATE OF MICHIGAN

SUPREME COURT

RODNEY MCCORMICK,

      Plaintiff-Appellant,

v                                                    No. 136738

LARRY CARRIER,

      Defendant,

and

ALLIED AUTOMOTIVE GROUP, INC.,
indemnitor of GENERAL MOTORS
CORPORATION,

      Defendant-Appellee.

_____

WEAVER, J. (*concurring*).

I concur in and sign all of the majority opinion except part III(B)(3), regarding

stare decisis. I fully support the decision to overrule *Kreiner v Fischer*, 471 Mich 109;

683 NW2d 611 (2004). As I wrote in *Jones v Olson*, 480 Mich 1169, 1173 (2008):

> By importing the concept of permanency of injury into MCL
> 500.3135—a concept that is nowhere referenced in the text of the statute—
> the majority of four (Chief Justice TAYLOR and Justices CORRIGAN,
> YOUNG, and MARKMAN), in *Kreiner v Fischer*, 471 Mich 109 (2004),
> actively and judicially legislated a permanency and temporal requirement to
> recover noneconomic damages in automobile accident cases. The *Kreiner*
> interpretation of MCL 500.3135 is an unrestrained misuse and abuse of the
> power of interpretation masquerading as an exercise in following the
> Legislature's intent.

With regard to the policy of stare decisis, my view is that past precedent should generally be followed but that to serve the rule of law, in deciding whether wrongly decided precedent should be overruled, each case should be looked at individually on its facts and merits through the lens of judicial restraint, common sense, and fairness. I agree with the sentiment recently expressed by Chief Justice Roberts of the United States Supreme Court in his concurrence to the decision in *Citizens United v Fed Election Comm*, 558 US ___, ___; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010), when he said that

> *stare decisis* is neither an "inexorable command," *Lawrence v. Texas*, 539 U.S. 558, 577, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), nor "a mechanical formula of adherence to the latest decision," *Helvering v. Hallock*, 309 U.S. 106, 119, 60 S. Ct. 444, 84 L. Ed. 604 (1940) . . . . If it were, segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants. See *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), overruled by *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954); *Adkins* v. *Children's Hospital of D. C.*, 261 U.S. 525, 43 S. Ct. 394, 67 L. Ed. 785 (1923), overruled by *West Coast Hotel Co v. Parrish*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937); *Olmstead v. United States*, 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), overruled by *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

Chief Justice Roberts further called stare decisis a "principle of policy" and said that it "is not an end in itself." *Id*. at ___; 130 S Ct at 920; 175 L Ed 2d at 807. He explained that "[i]ts greatest purpose is to serve a constitutional ideal—the rule of law. It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage

2

this constitutional ideal than to advance it, we must be more willing to depart from that precedent." *Id* at ___; 130 S Ct at 921; 175 L Ed 2d at 807.[1]

I agree with Chief Justice Roberts that stare decisis is a policy and not an immutable doctrine. I chose not to sign Chief Justice KELLY's lead opinion in *Petersen v Magna Corp*, 484 Mich 300, 316-320; 773 NW2d 564 (2009), because it proposed to create a standardized test for stare decisis. Likewise, I do not sign the majority opinion's stare decisis section in this case because it applies *Petersen*. There is no need for this Court to adopt any standardized test regarding stare decisis. In fact, it is an impossible

---

[1] It appears that the dissent in this case does not agree with Chief Justice Roberts. The dissent lists 12 cases that have been overruled by this Court in the past 18 months. While the dissenting justices may feel aggrieved by this Court overruling those 12 cases, amongst those cases were some of the most egregious examples of judicial activism that did great harm to the people of Michigan. Those decisions were made by the "majority of four," including the dissenting justices, under the guise of ideologies such as "textualism" and "judicial traditionalism." One of the dissenting justices, Justice YOUNG, expressed his apparent contempt for the common law and common sense in his 2004 article in the Texas Review of Law and Politics, where Justice YOUNG stated:

> Consequently, I want to focus my remarks here on the embarrassment that the common law presents—or ought to present—to a conscientious judicial traditionalist. . . .
>
> To give a graphic illustration of my feelings on the subject, I tend to think of the common law as a drunken, toothless ancient relative, sprawled prominently and in a state of nature on a settee in the middle of one's genteel garden party. Grandpa's presence is undoubtedly a cause of mortification to the host. But since only the most ill-bred of guests would be coarse enough to comment on Grandpa's presence and condition, all concerned simply try ignore him. [Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 301-302 (2004).]

task. There are many factors to consider when deciding whether or not to overrule precedent, and the importance of such factors often changes on a case-by-case basis.[2]

In the end, the consideration of stare decisis and whether to overrule wrongly decided precedent always includes service to the rule of law through an application and exercise of judicial restraint, common sense, and a sense of fairness—justice for all.

In serving the rule of law and applying judicial restraint, common sense, and a sense of fairness to the case at hand, I agree with and join the majority opinion's holding that *Kreiner* is overruled.

Elizabeth A. Weaver

---

[2] Over the past decade, the principal tool used by this Court to decide when a precedent should be overruled is the set of guidelines that was laid out in *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), an opinion written by former Justice TAYLOR, signed by Justices CORRIGAN, YOUNG, MARKMAN and myself, and that I have used numerous times. By no means do I consider the *Robinson* guidelines a "be-all, end-all test" that constitutes precedent of this Court to be used whenever this Court considers overruling precedent. I view *Robinson* as merely providing guidelines to assist this Court in its legal analysis when pertinent.

STATE OF MICHIGAN

SUPREME COURT

RODNEY MCCORMICK,

      Plaintiff-Appellant,

v

LARRY CARRIER,

      Defendant,

and

ALLIED AUTOMOTIVE GROUP, INC,
indemnitor of GENERAL MOTORS
CORPORATION,

      Defendant-Appellee.

No. 136738

_____

HATHAWAY, J. (*concurring*).

I fully concur with Justice CAVANAGH's analysis and conclusion in this matter and I support overruling *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004). I write separately to express my thoughts on the doctrine of stare decisis. Any analysis of the impact of stare decisis must focus on the individual case and the reason for overruling precedent.[1] The reasons for overruling *Kreiner* are paramount to any articulated test, and the special and compelling justifications to do so are overwhelming in this case. I agree

---

[1] For further discussion of my views regarding stare decisis, please see my concurring statement in *U of M v Titan Ins Co*, ___ Mich ___; ___ NW2d ___ (2010).

with the well-articulated reasons expressed by Justice CAVANAGH, and I fully support overruling *Kreiner*.

Diane M. Hathaway

RODNEY MCCORMICK,

        Plaintiff-Appellant,

v                                      No. 136738

LARRY CARRIER,

        Defendant,

and

ALLIED AUTOMOTIVE GROUP, INC,
indemnitor of GENERAL MOTORS
CORPORATION,

        Defendant-Appellee.

_____

MARKMAN, J. (*dissenting*).

I respectfully dissent from the majority's decision to overrule *Kreiner v Fischer,* 471 Mich 109; 683 NW2d 611 (2004). The no-fault automobile insurance act, MCL 500.3135(1), provides that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." The issue here is whether plaintiff has suffered a serious impairment of body function. "'[S]erious impairment of body function' means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7).

In *Kreiner,* 471 Mich at 132-133, this Court held that in determining whether an impairment affects the plaintiff's general ability to lead his normal life, "a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life." In addition, *Kreiner* indicated that certain factors, such as the duration of the impairment, may be of assistance in evaluating whether the plaintiff's general ability to lead his normal life has been affected. *Id.* at 133.

The majority overrules *Kreiner*, rejecting these factors and holding that temporal considerations are wholly or largely irrelevant in determining whether an impairment affects the plaintiff's general ability to lead his normal life. The majority instead holds that, as long as the plaintiff's general ability to lead his normal life has been affected, apparently for even a single moment in time, the plaintiff has suffered a "serious impairment of body function." This conclusion is at odds with the actual language of the no-fault automobile act and nullifies the legislative compromise embodied in that act. I continue to believe that *Kreiner* was correctly decided, and that temporal considerations are highly relevant-- indeed necessary-- in determining whether an impairment affects the plaintiff's general ability to lead his normal life. By nullifying the legislative compromise, which was grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance, the Court's decision today will resurrect a legal environment in which each of these hazards reappear and threaten the continued fiscal integrity of our no-fault system.

2

Because I do not believe that the lower courts erred in concluding that plaintiff in this case has not suffered a serious impairment of body function, I would affirm the judgment of the Court of Appeals.

## I. FACTS AND HISTORY

Because the majority opinion provides only a cursory presentation of the facts, in a case requiring a fact-intensive analysis, I find it necessary to set forth a more thorough discussion of these facts. Beginning in August of 2002, plaintiff was employed by Allied Systems, and over the years, he has held various positions with the company.[1] On January 17, 2005, approximately six months after beginning his position as a medium truck loader, plaintiff was struck by a truck driven by plaintiff's co-worker and co-defendant, Larry Carrier, while shuttling vehicles at a General Motors plant. Plaintiff was knocked down, and the wheels of the truck ran over his left ankle, fracturing his medial malleolus. Plaintiff was immediately taken to the hospital and was released that same day. Two days later, he underwent surgery for the implantation of a device to stabilize his ankle fracture. Immediately following surgery, plaintiff was on crutches and in a boot for approximately four weeks and, during this time, he was restricted from bearing weight on his left leg. Additionally, plaintiff underwent physical therapy.[2]

---

[1] Before plaintiff began working for Allied, he installed windows. When he first began working for Allied, he loaded trains, and after approximately six months, he took a "utility job," providing support to other departments as needed. In June of 2004, he began working as a medium truck loader.

[2] It is not altogether clear how long plaintiff's physical therapy actually lasted. In plaintiff's deposition, he indicated that he underwent "many months" of therapy.

On October 21, 2005, plaintiff again underwent surgery on his ankle, this time to remove the implanted device. The surgeon reported that plaintiff's ankle had "healed nicely." On November 5, 2005, at the request of Allied, plaintiff was examined by Dr. Paul Drouillard, who stated that plaintiff could return to work with restrictions of no prolonged standing or walking for three weeks, after which time, plaintiff could return to work with no restrictions. On November 17, 2005, plaintiff was examined by his surgeon, who observed that plaintiff's "wound is healed very nicely" and that plaintiff "needs to be in seated work for approximately six weeks."

On January 12, 2006, plaintiff's surgeon examined him and cleared him to return to work with no restrictions. At this examination, plaintiff reported to his surgeon that "[h]is medial malleolus is not giving him any pain." The surgeon observed that plaintiff had an "excellent range of motion with no specific tenderness." Upon returning to work for several days, however, plaintiff indicated that performing the physical tasks that his job required, such as walking, climbing, and crouching, caused his ankle to hurt. After plaintiff's request for a different assignment was denied, plaintiff went back on workers' compensation.

---

However, in his response to defendant's motion for summary disposition, plaintiff indicated that he had six weeks of therapy. And, during plaintiff's oral argument opposing defendant's motion for summary disposition, plaintiff's counsel claimed that plaintiff underwent 18 weeks of therapy.

4

On March 16, 2006, Allied required plaintiff to undergo a functional capacity evaluation (FCE),[3] which showed that plaintiff could not fully perform all of his previous job duties.[4] During this evaluation, when asked what his goal was in returning to work, plaintiff responded, "I don't want to go back to work; there is talk about a buyout and I think I want to do that." Plaintiff also reported that his ankle pain was a three on a scale of zero to ten, with ten being the highest.

On May 31, 2006, Dr. Drouillard again examined plaintiff, at the request of Allied. Dr. Drouillard found no objective abnormality to correspond to plaintiff's complaints and opined that plaintiff was magnifying his symptoms. Dr. Drouillard also observed that, although plaintiff claimed that he had been wearing an ankle brace for the last two weeks, the tan lines on plaintiff's left and right feet were symmetrical, consistent with wearing flip-flops, with no break in his tan lines to indicate that he had been wearing the brace at all. Dr. Drouillard believed that plaintiff could return to work unrestricted and that plaintiff's ankle required no further treatment.

On June 12, 2006, plaintiff underwent an MRI test; the physiatrist who reviewed the MRI and performed a follow-up examination found that there was some evidence of ligamentous injury, but he did not establish a plan to decrease plaintiff's pain because

---

[3] An FCE is "an all-encompassing term to describe the physical assessment of an individual's ability to perform work-related activity." American Occupational Therapy Association, <http://ww.aota.org/Consumers/WhatisOT/WI/Facts/35117.aspx> (accessed July 1, 2010).

[4] This was due in part to shoulder pain resulting from a preexisting and unrelated shoulder injury.

5

there was little the physiatrist could do.[5] At this examination, plaintiff reported that his pain was a six on a scale of zero to ten, that the pain was worse with "any movement," and that nothing alleviates that pain. On June 20, 2006, Dr. Drouillard reviewed the MRI results and found that plaintiff's ankle had healed well and that his opinion from May 31, 2006 had not changed.

Shortly thereafter, plaintiff's workers' compensation benefits were terminated.[6] At this point, *plaintiff* sought another FCE so that he could return to work. On August 1, 2006, the FCE indicated that plaintiff was able to perform essential job demands without restriction. At this FCE, plaintiff reported that he experienced "occasional aching" in his ankle, and that there were no "activities that aggravated his symptoms in the left ankle (including prolonged standing, prolonged walking)." Plaintiff reported that his pain level was a two on a scale of zero to ten and, during the two weeks immediately preceding the FCE, his highest pain level had been a three and his lowest pain level had been a one. By the completion of the FCE, plaintiff reported his pain level at zero. On August 16, 2006, approximately 17 months after the accident, plaintiff returned to work and Allied

---

[5] A physiatrist is a medical doctor who practices physiatry, "a medical specialty for the treatment of disease and injury by physical agents, as exercise or heat therapy." *Random House Webster's College Dictionary* (1991).

[6] Plaintiff began receiving workers' compensation in January 2005. Plaintiff claims that he lost $66,000 in wages, the difference between his salary and his workers' compensation benefits for the time he was not working. However, the instant case only involves noneconomic damages. Lost wages are economic damages and are compensable as personal protection insurance benefits, MCL 500.3107(1)(b), and/or through a tort claim against the party at fault to recover excess economic losses, MCL 500.3135(3)(c).

6

assigned him to a new job with different physical requirements, and with no reduction in pay. Plaintiff volunteered to be assigned to this other job, and has been able to perform his new job duties since that time.

During his recuperation, plaintiff did not require any assistance with normal household tasks. Additionally, he was able to drive and his injuries have not affected his relationship with his wife in any way.[7] Outside of work, plaintiff was able to engage in most of the activities in which he was engaged before his injury, such as fishing.[8] Importantly, by plaintiff's own admission at his deposition in October of 2006, his life was "normal" despite some "occasional aching."

On March 24, 2006, plaintiff filed a third-party action against Carrier (the driver of the truck) and General Motors Corporation (GM).[9] Carrier was later released by

---

[7] Plaintiff's wife has not brought a loss-of-consortium claim.

[8] Although the majority suggests that plaintiff returned to fishing at pre-injury levels by the spring and summer of 2006, the record indicates that plaintiff's fishing activities had never been interrupted. Plaintiff was asked if he "[s]till fish[ed] the same amount of time as [he] fished before the accident when [he] get[s] a chance," to which plaintiff replied, "When I get a chance." Furthermore, defendant argued in its motion for summary disposition that plaintiff's fishing activities were uninterrupted by the injury, and plaintiff did not dispute this. Plaintiff essentially conceded this fact and instead argued that the disruption in his life as a result of his injuries was centered on his inability to work. Plaintiff also was a weekend golfer. The record reflects that since plaintiff returned to work in August 2006, he had only golfed once, using a golf cart. We do not know whether plaintiff was able to golf during the time between his accident in January 2005 and August 2006. Defendant argued in its motion for summary disposition that plaintiff continued to engage in his pre-accident level of golfing activity, and again plaintiff did not argue to the contrary.

[9] With GM's bankruptcy, the parties stipulated to a change in case caption and party, adding Allied Automotive Group, Inc., indemnitor of GM; plaintiff's employer,

7

stipulation of the parties, and the trial court granted GM's motion for summary disposition, finding that plaintiff had undergone a relatively good recovery and could not meet the "serious impairment of body function" threshold.

The Court of Appeals affirmed, with one judge dissenting, concluding that the impairment did not affect plaintiff's general ability to lead his normal life. *McCormick v Carrier*, unpublished opinion per curiam of the Court of Appeals, issued March 25, 2008 (Docket No. 275888). The majority cited various facts to support its conclusion, such as plaintiff's golfing, fishing, driving, caring for himself, and returning to work without restriction. The dissent would have reversed for two reasons: first, on the basis that plaintiff's entire life, including the possibility of future problems, must be considered; and, second, on the basis that there was evidence to indicate that plaintiff's life was not currently normal. The evidence that the dissent relied on to reach this conclusion was that plaintiff was assigned to a job with reduced physical requirements and the doctors had identified "some indication of degenerative joint disease in [plaintiff's] ankle." *Id.,* unpub op at 2 (DAVIS, J., dissenting).

On October 22, 2008, this Court denied plaintiff's application for leave to appeal, although Chief Justice KELLY and Justices CAVANAGH and WEAVER would have granted leave to appeal. 482 Mich 1018 (2008). However, after the composition of this Court changed when Justice HATHAWAY replaced former Chief Justice TAYLOR on January 1,

---

Allied Systems, is a subsidiary of Allied Automotive Group, Inc. This Court entered an order in accordance with this stipulation. 485 Mich 851 (2009).

8

2009, this Court granted plaintiff's motion for reconsideration, even though such motion had not raised any new legal arguments. 485 Mich 851 (2009).

## II. STANDARD OF REVIEW

This case presents issues of statutory interpretation, which this Court reviews de novo. *Dep't of Transp v Tompkins*, 481 Mich 184, 190; 749 NW2d 716 (2008). We also review rulings on motions for summary disposition de novo. *Spiek v Dep't of Transp,* 456 Mich 331, 337; 572 NW2d 201 (1998).

## III. ANALYSIS

### A. HISTORY OF NO-FAULT INSURANCE ACT

In Michigan, before the enactment of the no-fault insurance act, the only available recourse to victims of motor vehicle accidents seeking to recover damages was to file a common-law tort action. "[U]nder [this] tort liability system[,] the doctrine of contributory negligence denied benefits to a high percentage of motor vehicle accident victims, minor injuries were overcompensated, serious injuries were undercompensated, long payment delays were commonplace, the court system was overburdened, and those with low income and little education suffered discrimination." *Shavers v Attorney General*, 402 Mich 554, 579; 267 NW2d 72 (1978). In response to these deficiencies, the Legislature enacted the no-fault automobile insurance act, MCL 500.3101 *et seq.*, effective March 30, 1973. The primary goal of the no-fault act is "to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses." *Shavers,* 402 Mich at 579. In order to meet this objective, the Legislature decided to make no-fault insurance compulsory, i.e., "whereby every Michigan motorist

9

would be required to purchase no-fault insurance or be unable to operate a motor vehicle legally in this state." *Id.* In addition, "[i]n exchange for the payment of . . . no-fault economic loss benefits from one's own insurance company, the Legislature limited an injured person's ability to sue a negligent operator or owner of a motor vehicle for bodily injuries." *Kreiner,* 471 Mich at 115. That is, with the enactment of the no-fault act, "the Legislature abolished tort liability generally in motor vehicle accident cases and replaced it with a regime that established that a person injured in such an accident is entitled to certain economic compensation from his own insurance company regardless of fault." *Id.* at 114.[10] In exchange for economic loss benefits regardless of fault, "the Legislature significantly limited the injured person's ability to sue a third party for noneconomic damages, e.g., pain and suffering." *Id.* at 115. More specifically, no tort suit against a third party for noneconomic damages is permitted unless the injured person "has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1).[11]

---

[10] The injured person's insurance company is responsible for all expenses incurred for medical care, recovery, and rehabilitation as long as the service, product, or accommodation is reasonably necessary and the charge is reasonable. MCL 500.3107(1)(a). There is no monetary limit on such expenses, and this entitlement can last for the person's lifetime. An injured person is also entitled to recover from his own insurance company up to three years of earnings loss, i.e., loss of income from work that the person would have performed if he had not been injured. MCL 500.3107(1)(b). An injured person can also recover "replacement" expenses, i.e., expenses reasonably incurred in obtaining ordinary and necessary services that the injured person would otherwise have performed. MCL 500.3107(1)(c). Further, an at-fault driver is still liable in tort for an injured person's excess economic damages. MCL 500.3135(3)(c).

[11] In its entirety, MCL 500.3135(1) provides:

The Legislature did not initially define the language that is in dispute in this case--"serious impairment of body function"-- and this Court itself struggled in the process of giving reasonable meaning to this language. In *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 481; 208 NW2d 469 (1973), we held that whether the plaintiff has suffered a "serious impairment of body function" is "within the province of the trier of fact . . . ." However, in *Cassidy v McGovern*, 415 Mich 483; 330 NW2d 22 (1982), noting that an advisory opinion "'is not precedentially binding in the same sense as a decision of the Court after a hearing on the merits,'" *id.* at 495 (citation omitted), this Court held:

> [W]hen there is no factual dispute regarding the nature and extent of a plaintiff's injuries, the question of serious impairment of body function shall be decided as a matter of law by the court. Likewise, if there is a factual dispute as to the nature and extent of a plaintiff's injuries, but the dispute is not material to the determination whether plaintiff has suffered a serious impairment of body function, the court shall rule as a matter of law whether the threshold requirement . . . has been met. [*Id.* at 502.]

In addition, *Cassidy* held that the phrase "serious impairment of body function" refers to "objectively manifested injuries" that impair "important body functions." *Id.* at 504-505. *Cassidy* also held that "the Legislature intended an objective standard that looks to the effect of an injury on the person's general ability to live a normal life." *Id.* at 505. Finally, *Cassidy* held that although "an injury need not be permanent to be serious,"

---

A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

11

"[p]ermanency is, nevertheless, relevant" because "[t]wo injuries identical except that one is permanent do differ in seriousness." *Id.* at 505-506.

However, only four years later, in *DiFranco v Pickard*, 427 Mich 32; 398 NW2d 896 (1986), this Court overruled *Cassidy*. *DiFranco* held that "[i]f reasonable minds can differ as to whether the plaintiff suffered a serious impairment of body function, the issue must be submitted to the jury, even if the evidentiary facts are undisputed. *Id.* at 58. In addition, *DiFranco* held that the "impairment need not be of . . . an important body function," and it is unnecessary to look to the effect of the injury on the person's "'general ability to live a normal life.'" *Id.* at 39. *DiFranco* also held that, although the plaintiff must prove a "medically identifiable injury," this can be done on the basis of "the plaintiff's subjective complaints or the symptoms of an injury." *Id.* at 75. Finally, *DiFranco* held that the following factors should be considered when determining whether the impairment was serious:

> The extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. [*Id.* at 69-70.]

In 1995, the Legislature amended the no-fault act. In particular, it amended MCL 500.3135(2)(a), which provides:

> The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
>
> *(i)* There is no factual dispute concerning the nature and extent of the person's injuries.
>
> *(ii)* There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to

12

whether the person has suffered a serious impairment of body function or permanent serious disfigurement.

In addition, the Legislature defined "serious impairment of body function" to mean "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7). In other words, the Legislature essentially rejected *DiFranco* and, with one exception, codified *Cassidy*.[12]

## B. *KREINER V FISCHER*

In *Kreiner,* this Court for the first time interpreted the Legislature's definition of "serious impairment of body function." Because "generally" means "'for the most part,'" *Kreiner* held that "determining whether a plaintiff is 'generally able' to lead his normal life requires considering whether the plaintiff is, 'for the most part' able to lead his normal life." *Kreiner,* 471 Mich at 130, quoting *Random House Webster's College Dictionary* (1991). In addition, because "lead" means "'to conduct or bring in a particular course,'" *Kreiner* held that "the effect of the impairment on the course of a plaintiff's entire normal life must be considered." *Id.* at 130-131, quoting *Random House Webster's Unabridged Dictionary* (2001). Therefore, *Kreiner* concluded, "[a]lthough some aspects of a plaintiff's entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiff's normal life has not

---

[12] That one exception is that while *Cassidy,* 415 Mich at 505, required an evaluation of "the effect of an injury on the person's general ability to live *a* normal life," MCL 500.3135(7) requires an evaluation of the effect of an injury on "the person's general ability to lead *his or her* normal life." (Emphasis added.) That is, while the *Cassidy* test was exclusively objective, the MCL 500.3135(7) test is at least partially subjective.

been affected, then the plaintiff's 'general ability' to lead his normal life has not been affected and he does not meet the 'serious impairment of body function' threshold." *Id.* at 131.

*Kreiner* established a "multi-step process . . . for separating out those plaintiffs who meet the statutory threshold from those who do not." *Id.* First, the court must determine whether there is a factual dispute that is material to the determination whether the person has suffered a serious impairment of body function.[13] Second, the court must determine whether an important body function has been impaired. Third, the court must determine whether the impairment is objectively manifested.[14] Finally, the court must determine whether the impairment affects the plaintiff's general ability to lead his or her normal life. "In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life." *Id.* at 132-133. *Kreiner* indicated that the following factors may be of assistance in evaluating whether the plaintiff's general ability to conduct the course of his normal life has been affected:

---

[13] If there is such a dispute, the court cannot decide the issue as a matter of law; however, if there is no such dispute, the court can so decide.

[14] "Subjective complaints that are not medically documented are insufficient." *Id.* at 132.

(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment,[15] (d) the extent of any residual impairment,[16] and (e) the prognosis for eventual recovery. [*Id.* at 133.]

Although the dissent in *Kreiner* essentially agreed with the majority's analysis of the language "an objectively manifested impairment of an important body function," it disagreed with the majority's analysis of the language "that affects the person's general ability to lead his or her normal life." Most significantly in this regard, the dissent rejected the factors set forth by the majority on the basis that "time or temporal considerations" are inappropriate considerations. *Id.* at 147 (CAVANAGH, J., dissenting).

## C. MAJORITY'S NEW TEST

It is appropriate that Justice CAVANAGH, the authoring justice of the majority opinion in *DiFranco,* which was rejected by the Legislature, and also the authoring justice of the dissent in *Kreiner,* which was rejected by this Court, is now the authoring justice of the majority opinion, in which *Kreiner* is overruled. While to some, there may be a sense of justice, or at least a sense of irony, in this sequence of events, to others, including those of us in dissent in this case, such sequence embodies all that is wrong when a judiciary confuses its own preferences with those of the people's representatives in the Legislature. While it is intriguing that Justice CAVANAGH now is able to transform his dissent in *Kreiner* into a majority opinion, and thereby resuscitate his earlier opinion

---

[15] "While an injury need not be permanent, it must be of sufficient duration to affect the course of a plaintiff's life." *Id.* at 135.

[16] "Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point." *Id.* at 133 n 17.

in *DiFranco*, this has been achieved only after the people of this state, through their Legislature, have made clear that *DiFranco* did *not* reflect what ought to be the policy of this state. Therefore, just as he did in his dissent in *Kreiner,* Justice CAVANAGH, now with majority support, rejects *Kreiner's* analysis of the language "that affects the person's general ability to lead his or her normal life." The worm has turned, and never mind what the people and their Legislature have sought to accomplish in establishing as the law.

Before proceeding too far into where our substantive disagreements lie, I would be remiss not to point out where we are in agreement. First, the majority, just as did the *Kreiner* dissent*,* largely agrees with *Kreiner*'s analysis of MCL 500.3135(2)(a), i.e., if there is no material factual dispute, whether a person has suffered a serious impairment of body function should be determined by the court as a matter of law.[17] The majority also

---

[17] However, the majority indicates that this statute "could unconstitutionally conflict with MCR 2.116(C)(10) . . . ." Because I see no conflict between the statute and the court rule, i.e., each allows the court to determine as a matter of law whether a person has suffered a serious impairment of body function *only* if there are no material factual disputes, I do not believe the statute is in any way unconstitutional. Moreover, the case cited by the majority in support of its suggestion that jury trials "promote judicial efficiency" actually stands for the exact opposite proposition. See *Moll v Abbott Laboratories,* 444 Mich 1, 26; 506 NW2d 816 (1993) ("Both our court rules and case law recognize the desirability of allowing summary disposition, regardless of a jury request, when uncontroverted facts are presented to the court. This promotes efficiency and preservation of judicial resources."). It is interesting that, although the majority acknowledges that the constitutionality of MCL 500.3135(2)(a) is not at issue here, it repeatedly implies that MCL 500.3135(2)(a) "could" be unconstitutional, thus, making it obvious that MCL 500.3135(2)(a) will also likely fall within the majority's effort to expunge the jurisprudence of the past decade.

16

largely agrees with *Kreiner*'s analysis of the language, "an objectively manifested impairment of an important body function."[18]  In addition, the majority agrees with *Kreiner*'s conclusion that the serious impairment of body function threshold entails a subjective analysis, i.e., "[w]hether an impairment that precludes a person from throwing a ninety-five miles-an-hour fastball is a 'serious impairment of body function' may depend on whether the person is a professional baseball player or an accountant who likes to play catch with his son every once in a while." *Kreiner,* 471 Mich at 134 n 19.  The

---

I also disagree with the majority that "the disputed fact does not need to be outcome determinative in order to be material . . . ."  MCL 500.3135(2)(a)*(ii)* states, "whether an injured person has suffered serious impairment of body function . . . [is a] question [] of law for the court if the court finds . . . [that the] factual dispute . . . is not material to the determination as to whether the person has suffered a serious impairment of body function . . . ."  That is, "[a]bsent an *outcome-determinative* genuine factual dispute, the issue of threshold injury is now a question of law for the court."  *Kern v Blethen-Coluni*, 240 Mich App 333, 341; 612 NW2d 838 (2000) (emphasis added).  Although the majority cites Black's Law Dictionary (8th ed) in support of its proposition that "the disputed fact does not need to be outcome determinative in order to be material," Black's Law Dictionary (6th ed) states the very opposite-- "[m]aterial fact is one upon which outcome of litigation depends."  See also Black's Law Dictionary (8th ed), which defines "material" as "[h]aving some logical connection with the consequential facts," and *Random House Webster's College Dictionary,* which defines "material" as "likely to influence the determination of a case."

[18] The majority does take issue with *Kreiner*'s conclusion that "[s]ubjective complaints that are not medically documented are insufficient" to establish that an impairment is "objectively manifested." *Kreiner,* 471 Mich at 132.  However, given that the majority agrees that "plaintiffs must 'introduce evidence establishing that there is a physical basis for their subjective complaints of pain and suffering,'" quoting *DiFranco,* 427 Mich at 74, and I am uncertain what evidence *other* than medical documentation would establish such a "physical basis," it is not clear why the majority objects to *Kreiner*'s statement that medical documentation is required.  See also *DiFranco,* 427 Mich at 75 ("The 'serious impairment of body function' threshold requires the plaintiff to prove that his noneconomic losses arose out of a *medically identifiable* injury which seriously impaired a body function.") (emphasis added).

17

majority also agrees with *Kreiner*'s conclusion that determining whether a plaintiff's general ability to lead his or her normal life has been affected "necessarily requires a comparison of the plaintiff's life before and after the incident."[19]  Finally, the majority agrees with *Kreiner*'s conclusion that permanency is not required.[20]

### 1. *DIFRANCO VS. CASSIDY*

However, this is where our agreements end.  First, the majority takes issue with *Kreiner's* statement that "the Legislature largely rejected *DiFranco* in favor of *Cassidy*." *Kreiner,* 471 Mich at 121 n 8.  As explained earlier, the Legislature adopted *Cassidy* with a single exception.  That single exception pertains to the fact that *Cassidy,* 415 Mich at 505, required an evaluation of "the effect of an injury on the person's general ability to live *a* normal life," while MCL 500.3135(7) requires an evaluation of the effect of an injury on "the person's general ability to lead *his or her* normal life."  (Emphasis added.) That is, while the *Cassidy* test was entirely objective, the MCL 500.3135(7) test is at least partially subjective.  As this Court explained in *Kreiner,* 471 Mich at 121 n 7:

> [T]he Legislature modified the entirely objective *Cassidy* standard to a partially objective and partially subjective inquiry. Thus, what is "normal" is to be determined subjectively on the basis of the plaintiff's own life and not the life of some objective third party.  However, once that is

---

[19] The majority also indicates that "many other considerations could typically be relevant to determining how an impairment affects a person's ability to live in his or her pre-incident normal manner of living."  The majority does not offer any further explanation as to what these "many other considerations" might conceivably be.

[20] Although *Kreiner,* 471 Mich at 135, specifically held that "an injury need not be permanent," the majority nonetheless criticizes it for "effectively creat[ing] a permanency requirement."

18

fixed as the base, it is to be objectively determined whether the impairment in fact affects the plaintiff's "general ability to lead" that life.

Nevertheless, given that: (a) *Cassidy,* 415 Mich at 505, held that courts *should* "look[] to the effect of an injury on the person's general ability to live a normal life"; (b) *DiFranco,* 427 Mich at 39, held that courts *should not* look to the effect of the injury on the person's "'general ability to live a normal life'"; and (c) the Legislature subsequently and affirmatively directed the courts to look to the effect of an injury on "the person's general ability to lead his or her normal life," MCL 500.3135(7), the Legislature obviously preferred the policy of *Cassidy* to that of *DiFranco*. In addition, in contrast to *DiFranco*, and consistent with *Cassidy,* the Legislature expressly adopted an "important body function" requirement, MCL 500.3135(7), and amended MCL 500.3135 to make clear that whether a serious impairment of body function has occurred is a question of law unless there is a material factual dispute. MCL 500.3135(2)(a). Thus, contrary to the majority's understandably defensive posture, it is hardly an "oversimplification" to conclude that the Legislature essentially rejected *DiFranco* in favor of *Cassidy*.[21]

Moreover, the Legislature's action of amending MCL 500.3135 following *DiFranco* is an example of legislative history that has genuine utility in the interpretative process. This Court has emphasized that "not all legislative history is of equal value," and has specifically noted that "[c]learly of the highest quality is legislative history that relates to an action of the Legislature from which a court may draw reasonable inferences

---

[21] Contrary to the majority's contention, this dissent very clearly provides in the above language "specific, substantive arguments" in support of this conclusion.

19

about the Legislature's intent . . . ." *In re Certified Question*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). The instant case presents an ideal "[e]xample[] of legitimate legislative history," i.e., the recitation of "actions of the Legislature intended to repudiate the judicial construction of a statute . . . ." *Id.* And yet, not altogether inexplicably, the majority entirely disregards these legislative actions.

Defendant and amicus curiae the Attorney General have presented the Court with legislative analyses, committee reports, and other materials to support their argument that, in enacting the amendments, the Legislature intended to repudiate *DiFranco* and restore *Cassidy*, just as *Kreiner* held. Even the most cursory review of these documents demonstrates that defendant and its amicus' reading has merit. For example, the original draft of House Bill 4341 was accompanied by a memorandum from its sponsor that stated that the bill's *first* goal was to "[r]eestablish the two-part *Cassidy* standard of: (1) definition of 'serious impairment of body function,' and (2) make the determination of whether an injury is a serious impairment of body function a question of law (judge) rather than of fact (jury)." Memorandum of Representative Harold Voorhees enclosing the original draft of HB 4341, February 8, 1995. Similarly, the House Legislative Analysis expressly set forth the chronology of *Cassidy* and *DiFranco*, noting that *DiFranco* had "rejected" *Cassidy* and that the bill "would return to a tort threshold resembling that provided by the *Cassidy* ruling . . . ." House Legislative Analysis, HB 4341, December 18, 1995. The analysis provided to the Senate Financial Services Committee likewise explained *in the first sentence of the bill's description* that it "would put into law the *Cassidy* standards for meeting the serious impairment of body function

20

threshold." Department of Commerce Bill Analysis of HB 4341, February 14, 1995. And finally, it is apparent from the statements of protest of the bill's opponents that they also clearly understood House Bill 4341 to be a "return to the *Cassidy* standard." Statements of Senator Henry Stallings and Senator John Cherry, October 12, 1995.

While on several occasions I have explained why I do not find all forms of legislative history to be useful tools in the interpretative process, see, e.g., *Petersen v Magna Corp*, 484 Mich 300, 381-382; 773 NW2d 564 (2009) (MARKMAN, J., dissenting), the author of the majority opinion has never questioned their utility.[22] Thus,

---

[22] The authoring justice states, "I have repeatedly stated that legislative history should only be used when statutory language is ambiguous." Although, in some cases, he has asserted this, see, for example, *People v Gardner*, 482 Mich 41; 753 NW2d 78 (2008) (CAVANAGH, J., dissenting); *Bukowski v Detroit*, 478 Mich 268; 732 NW2d 75 (2007) (CAVANAGH, J., concurring); *People v Derror,* 475 Mich 316; 715 NW2d 822 (2006) (CAVANAGH, J., dissenting); *Lansing Mayor v Pub Serv Comm*, 470 Mich 154; 680 NW2d 840 (2004) (CAVANAGH, J., dissenting), in other cases, he has suggested that legislative history can be considered even though the statute is not ambiguous, see, for example, *Jackson v Green Estate*, 484 Mich 209, 230; 771 NW2d 675 (2009) (CAVANAGH, J., dissenting) ("Not only is this interpretation consistent with the *plain language* of the statute, it is also consistent with the *legislative history* of the statute.") (emphasis added); *Koester v City of Novi*, 458 Mich 1; 580 NW2d 835 (1998); *Elias Bros Restaurants v Treasury Dep't*, 452 Mich 144; 549 NW2d 837 (1996) (CAVANAGH, J., concurring); *People v Barrera*, 451 Mich 261; 547 NW2d 280 (1996); *People v Sloan*, 450 Mich 160; 538 NW2d 380 (1995); *Orzel v Scott Drug Co*, 449 Mich 550; 537 NW2d 208 (1995); *Gardner v Van Buren Pub Schools*, 445 Mich 23; 517 NW2d 1 (1994); *Grand Trunk Western R Co v Fenton*, 439 Mich 240; 482 NW2d 706 (1992); *Romein v General Motors Corp*, 436 Mich 515; 462 NW2d 555 (1990). Further, given the definition of "ambiguous" supported by the authoring justice, see *Petersen,* 484 Mich at 329 (KELLY, C.J., lead opinion) (quoting *Yellow Freight Sys, Inc v Michigan,* 464 Mich 21, 38; 627 NW2d 236 [2001], for the proposition that "'[w]hen a statute is capable of being understood by reasonably well-informed persons in two or more different senses, [a] statute is ambiguous'"), and the different understandings given to the statute here by the majority and dissenting justices, I fail to see how, *by his own standards*, he can

21

there is no apparent reason why the majority "turn[s] a blind eye to the wealth of extrinsic information available" on the history of the 1995 amendments. *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 95 n 34; 748 NW2d 524 (2008) (KELLY, J., dissenting). Rather, the only, quite obvious explanation for the majority's selective silence is that it can find *nothing* in this "wealth of extrinsic information available" to support its interpretation. One of the most common and compelling critiques of the use of legislative history is that a judge can almost always find *something* in the legislative history to support the interpretation he personally wishes to give to a law. To borrow an analogy invoked by United States Supreme Court Justice Antonin Scalia, using legislative history is like entering a room, looking over the assembled multitudes in the crowd, and picking out your friends. See Scalia, *A Matter of Interpretation* (Princeton, NJ: Princeton University Press, 1997), at 36. In its near silence, the majority places a new twist on this analogy, and illustrates another fundamental problem with the use of legislative history. Here, the majority enters a room, and, finding *no* friends in sight, makes a quick exit. Considering the quality and quantity of the legislative history available here, the majority's "quick exit" and its selective silence on the subject speaks volumes. It should not go unremarked that it is this dissent that cites legislative history-- albeit a uniquely persuasive and bona fide form of legislative history-- as a relevant factor in interpreting MCL 500.3135, while the justices of the majority, the supposed advocates

---

conclude that the statute is unambiguous, unless, of course, he does not believe that the dissenting justices are "reasonably well-informed persons."

of this mode of interpretation, exclude this from their consideration. Apparently, legislative history is to be considered when it supports a justice's preferred interpretation, and ignored when it does not.

Indeed, the problem with this approach of *sometimes* relying on legislative history and sometimes not is, as I explained in my dissent in *Petersen,* 484 Mich at 381-382, that

> it is a process in which judges in the very guise of selecting the tools and factors to be employed in "interpreting" the law are effectively its formulators-- in short, judges who are wielding the legislative, not the judicial, power.
>
> A critical strength of a judicial philosophy committed to exercising only the constitution's "judicial power" is that reasonably clear rules of decision-making are established *before the fact*. That is, a judge essentially promises the parties that he or she will decide their case, as with all others, by attempting to discern the reasonable meaning of relevant statutes or contracts and that this will be done by relying upon recognized rules, and tools, of interpretation. By contrast, under the [majority's] approach . . . , in which there is essentially a limitless array of rules, and tools, that may be employed for "defining" the law apart from its language, there is no consistently applied interpretative process with which the judge promises beforehand to comply. He or she may promise to be "fair," and he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each dispute on a case-by-case basis, using whatever rules, and whichever tools, he or she believes are required in that instance. And the suspicion simply cannot be avoided that these varying and indeterminate rules, and tools, may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes. Any interpretative rules will be identified only *after the fact*, and these "rules" may or may not have been invoked in resolving yesterday's dispute, and may or may not be employed in resolving tomorrow's dispute. Any judge can concoct an *after-the-fact* rationale for a decision; the *judicial* process, however, is predicated upon *before-the-fact* rationales. An *ad hoc* process is not a judicial process at all. In the place of predetermined rules-- otherwise understood as the rule of law-- the [majority] would substitute rules to be determined later. [Emphasis in the original.]

23

## 2. "TRAJECTORY" AND "ENTIRE"

Next, the majority peremptorily rejects *Kreiner*'s use of the words "trajectory" and "entire." Again, the pertinent statutory language being defined here is, "that affects the person's general ability to lead his or her normal life." MCL 500.3135(7). "Lead" is defined as "to conduct or bring . . . in a particular course," and, as the majority acknowledges, "'trajectory' is a synonym for 'course.'" *Random House Webster's College Dictionary* (1991). In addition, contrary to the majority's contention, *Kreiner*'s use of the word "entire" was not "created out of thin air." Instead, the use of the word "entire" derived from the Legislature's use of the word "general" because "in general" means "with respect to the *entirety*." *Random House Webster's College Dictionary* (1991) (emphasis added). More accurately, it is the meaning that the majority gives to "general" that is "created out of thin air." The majority concludes that the word "general" means "some," even though the definition that the majority itself relies upon does not even include "some," but instead indicates that "general" means "whole," "every," "majority," "prevalent," "usually," "in most instances," "not limited," and "main features." Nowhere among these possible meanings can a reader sight the word "some."[23]

---

[23] I find it interesting that the authoring justice of the majority opinion once chastised me for "leav[ing] no dictionary unturned," with regards to an opinion in which I cited *two* different dictionaries, *People v Raby,* 456 Mich 487, 501; 572 NW2d 644 (1998) (CAVANAGH, J., dissenting), and, here, he cites *seven* different dictionaries and still cannot quite find a definition that serves his purpose. While considering relevant dictionary definitions can be a valuable tool of interpretation, the majority's generous use of dictionaries here is noteworthy because the majority has questioned the propriety and

## 3. TEMPORAL CONSIDERATIONS

Finally, the majority rejects the non-exhaustive list of factors that *Kreiner* set forth for consideration in evaluating whether the plaintiff's general ability to lead his normal life has been affected. The majority asserts that *Kreiner* "departed . . . from the statutory text, by providing an extra-textual 'nonexhaustive list of objective factors' to be used to compare the plaintiff's pre- and post-incident lifestyle." This critique is quite surprising given that it is not uncommon for courts in general, and for this Court in particular, to provide "extra-textual" factors to be considered in interpreting a statute that demands a fact-specific analysis.[24] To the best of my knowledge, members of this majority have never before complained about this practice, but consistency in the application and non-application of interpretative factors is hardly a preoccupation of this majority.[25]

---

usefulness of this tool in the past. *Jones v Olson*, 480 Mich 1169, 1176 (2008) ("In the legal context, using a dictionary to unwaveringly determine the legislative intent behind a statute is nothing more than barely hidden judicial activism.") (WEAVER, J., dissenting) (Then-Justice KELLY and Justice CAVANAGH joined Justice WEAVER's dissenting statement).

[24] I use the phrase "extra-textual" factors only because this is the phrase the majority uses. However, in truth, I do not believe that the factors articulated in *Kreiner* are at all "extra-textual," because these have been derived directly from the text of the statute itself.

[25] Indeed, as I explained in my dissent in *Petersen,* 484 Mich at 380, the majority's "interpretative" process seems to consist of "picking and choosing at [its] discretion from among some uncertain array of tools lying 'beyond the plain language of the statute [or contract].'" (Citation omitted.) The problem with this approach is that "[t]he litigants will, of course, have no notice beforehand of which tools are to be employed, for the justices themselves will not know this beforehand." *Id.* The rule gleaned from the instant case is apparently that it is appropriate to employ "extra-textual" factors, but only

Indeed, in *DiFranco* itself, Justice CAVANAGH provided numerous "extra-textual" factors to be considered in determining whether a plaintiff has established a serious impairment of body function. *DiFranco,* 427 Mich at 69-70, states:

> In determining whether the impairment of body function was serious, the jury should consider such factors as the extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors.

Indeed, these "extra-textual" factors are remarkably similar to the *Kreiner* factors: "(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery." *Kreiner,* 471 Mich at 133. It not clear why the authoring justice thought it acceptable to list "extra-textual" factors in *DiFranco*, but unacceptable to cite virtually the same factors in *Kreiner*. In addition, in *Wexford Med Group v City of Cadillac*, 474 Mich 192; 713 NW2d 734 (2006), he listed "extra-textual" factors a court should consider in determining whether an entity is a "charitable institution" and thus exempt from ad valorem property taxes. Also, in *Chmielewski v Xermac, Inc*, 457 Mich 593, 633; 580 NW2d 817 (1998), the Court considered the Handicapper's Civil Rights Act requirement that to be handicapped one must be "substantially limited in a major life activity." MCL 37.1103(e)(i)(A). Then-Justice KELLY, joined by Justice CAVANAGH, stated in dissent:

---

where the majority wishes to do so. The parties will be made aware of the majority's inclinations, but only after a decision has been issued.

26

I would hold that the following factors should be considered to determine whether an individual is substantially limited in a major life activity: (1) the nature of the impairment, (2) its severity, (3) its duration or expected duration, and (4) its long-term effect. [*Chmielewski,* 457 Mich at 63.]

See, also, *Wood v Detroit Auto Inter-Ins Exch*, 413 Mich 573; 321 NW2d 653 (1982), listing several "extra-textual" factors a court should consider in awarding "reasonable" attorney fees under MCL 500.3148(1);[26] *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 496-497; 274 NW2d 373 (1979), adopting a four-factor test to determine whether for purposes of the no-fault act a person is "domiciled in the same household" as a relative pursuant to MCL 500.3114; *Stewart v Michigan*, 471 Mich 692, 698-699; 692 NW2d 376 (2004), stating "extra-textual" "factors such as the manner, location, and fashion in which a vehicle is parked" are material to determining whether the parked vehicle poses an unreasonable risk under MCL 500.3106(1); and *Reed v Yackell*, 473 Mich 520; 703 NW2d 1 (2005), utilizing an "extra-textual" multi-factor economic-reality test to determine who is an employer for purposes of the Worker's Disability Compensation Act.

As should be readily apparent, the majority's claim that *Kreiner* erred by including "extra-textual" factors to consider in interpreting a statute is a wholly manufactured concern. The statute *requires* a fact-specific analysis. As Justice CAVANAGH's *DiFranco* opinion and numerous other decisions of this Court have recognized, such

---

[26] In his dissent in *Smith v Khouri*, 481 Mich 519, 544; 751 NW2d 472 (2008), Justice CAVANAGH affirmed his satisfaction with the *Wood* "factors," even though these factors are obviously "extra-textual."

27

factors assist courts in applying the statutory language on a case-by-case basis. To date, none of the members of the majority have objected to the inclusion of such factors in any other of this Court's decisions.

Nevertheless, the majority rejects *Kreiner*'s "extra-textual" factors on the basis that they all "include a temporal component," reiterating the argument made by the *Kreiner* dissent that "the statute does not create an express temporal requirement as to how long an impairment must last." *Ante* at __, see also *Kreiner,* 471 Mich at 147 (CAVANAGH, J., dissenting) ("[T]he serious impairment of body function threshold does not suggest any sort of temporal limitation. . . . Therefore, the duration of the impairment is not an appropriate inquiry."). Indeed, the majority now holds that it is unnecessary to consider whether the impairment even "*continues* to affect [plaintiff's] general ability to lead his pre-incident 'normal life' . . . ." (Emphasis added.)

The majority, not surprisingly, claims that this dissent mischaracterizes its holding when we conclude that temporal considerations are wholly or largely irrelevant in the majority's holding. Not only, as explained above, is my characterization of their holding supported by the actual language of the majority opinion, but it is also dictated by simple *logic*. That is, given that the majority rejects *Kreiner's* factors because they all "include a temporal component," given that it feels passionately enough about this to write a lengthy opinion overruling *Kreiner,* and given that we can discern no other significant departure

28

from *Kreiner* in the majority's new test than that of the temporal component,[27] it is difficult to escape the conclusion we reach here, that the majority believes that temporal considerations are wholly or largely irrelevant.

I am reminded of a famous Sherlock Holmes line:

> "How often have I said to you that when you have eliminated the impossible, whatever remains, *however improbable*, must be the truth?" [A. Conan Doyle, *The Sign of the Four,* from *The Complete Sherlock Holmes* (New York: Doubleday, 1890), ch 6, p 111.]

That is, given that the majority essentially agrees with everything in *Kreiner* <u>but</u> its temporal considerations,[28] *Kreiner*'s temporal considerations are all that remain as to our

---

[27] As explained above, there are other discrepancies between *Kreiner* and the majority's opinion, i.e., the *DiFranco/Cassidy* and the "trajectory/entire" discrepancies. However, these two discrepancies are intertwined with our disagreement about whether temporal considerations should be considered. By returning our law to *DiFranco,* at which time the plaintiff's "general ability to lead his or her normal life" was not at issue, it is much easier for the majority to claim that temporal considerations are wholly or largely irrelevant. In addition, because the majority believes that it is inappropriate to consider either the "trajectory" or the "entire" person's life, it believes that temporal considerations, such as the duration of the impairment, are wholly or largely irrelevant. However, because we conclude that the statute clearly precludes a return to *DiFranco*, since the Legislature has very clearly indicated that the plaintiff's "general ability to lead his or her normal life" is at issue, we believe that temporal considerations are relevant. Similarly, because we believe that the "trajectory" or the "entire" person's life should be considered, we believe that temporal considerations, such as the duration of the impairment, are, in fact, highly relevant.

[28] The majority essentially agrees with: (1) *Kreiner*'s analysis of MCL 500.3135(2)(a), i.e., if there is no material factual dispute, whether a person has suffered a serious impairment of body function should be determined by the court as a matter of law; (2) *Kreiner*'s analysis of the language, "an objectively manifested impairment of an important body function"; (3) *Kreiner*'s conclusion that the serious impairment of body function threshold entails a subjective analysis; (4) *Kreiner*'s conclusion that determining whether a plaintiff's general ability to lead his or her normal life has been affected

29

disagreement. Therefore, that the majority disagrees with *Kreiner*'s temporal considerations, such as the duration of the impairment, "must be the truth." In other words, when comparing the *Kreiner* test and the majority's new test-- whatever that is intended to be-- the only apparent substantive difference is that, while *Kreiner* expressly includes temporal considerations, the majority's test does not. Given that the majority essentially agrees with everything in *Kreiner* but its temporal considerations, and given that the only reason it gives for rejecting these considerations is that they all "include a temporal component," how can we deduce anything *other* than that the majority holds that temporal considerations, such as the duration of the impairment, are irrelevant?

Furthermore, if temporal considerations are not irrelevant, why does the majority not explain *in what way* these *are* relevant, or how, in fact, the majority views the relevancy of temporal considerations, and how these views differ from those expressed in *Kreiner*? This glaring void in explanation of its own test in the majority opinion can only be explained by the fact that the majority is holding that temporal considerations are wholly or largely irrelevant.

In sum, if temporal considerations are relevant: (1) why *is* the majority overruling *Kreiner*; (2) why does the majority reject *Kreiner*'s factors, such as the duration of the impairment; (3) why does the majority not include temporal considerations within its new test; (4) why does the majority fail to explain the relevancy of temporal considerations;

"necessarily requires a comparison of the plaintiff's life before and after the incident"; and (5) *Kreiner*'s conclusion that permanency is not required.

(5) why does the majority conclude that it is unnecessary to consider whether the impairment "*continues* to affect [plaintiff's] general ability to lead his pre-incident 'normal life'"; and (6) perhaps most tellingly, why does not the majority clarify its position, whatever it may be, in light of this dissent? Simply saying that our conclusion is "erroneous" does not make it so, and, even more to the point, will hardly assist the bench and bar of this state in determining whether, and how, temporal considerations somehow remain relevant after today's decision.

For these reasons, we are unable to avoid the conclusion that the majority is, indeed, holding that temporal considerations are wholly or largely irrelevant, even though this "improbable" result constitutes a departure from *Cassidy*, *DiFranco*, and *Kreiner*, and makes utterly no sense. How can it possibly be determined whether an impairment "affects the person's general ability to lead his or her normal life" without taking into account temporal considerations? As *Kreiner*, 471 Mich at 133 n 18, inquired:

> Does the dissent [now the majority] really believe that an impairment lasting only a few moments has the same effect on a person's "general ability to lead his or her normal life" as an impairment lasting several years or that an impairment requiring annual treatment has the same effect on a person's "general ability to lead his or her normal life" as an impairment requiring daily treatment?

Does the majority really believe that the Legislature intended for the serious impairment threshold to be met in every instance where an objectively manifested impairment of an important body function affected a person's ability to lead his normal life for a mere moment in time? What if a person gets hit in the head and passes out for five minutes, but after those five minutes is completely unaffected by the impairment? If all temporal

31

considerations are irrelevant, would not this person satisfy the majority's threshold, because his general ability to lead his normal life was certainly affected for those five minutes of unconsciousness?  Under the majority's rule, it is apparently irrelevant that the person arose after those five minutes and led a completely normal life thereafter.  The majority asserts that all that matters is that for that moment in time, the person's general ability to lead his normal life had been affected.  I am not sure that the majority's new threshold can even be called a "threshold" when it can be satisfied in virtually every automobile accident case that results in injury.[29]  As long as the plaintiff has suffered an objectively manifested impairment of an important body function, that plaintiff will have satisfied the majority's threshold, because the majority has essentially read the third criterion, i.e., "that affects the person's general ability to lead his or her normal life," out of the statute.

The clearest illustration of the difficulty in determining whether an impairment "affects the person's general ability to lead his or her normal life" without taking into account temporal considerations is the majority's *own* inability to do so.[30]  In determining

---

[29] It certainly is a "threshold" bearing no resemblance to the other two thresholds-- "permanent serious disfigurement" and "death."  See MCL 500.3135(1).

[30] The majority criticizes *Kreiner* as "def[ying] practical workability" on the basis that "*Kreiner* has led to inconsistent interpretation of the statutory language, with similarly situated plaintiffs being treated differently by different courts."  However, in his opinion in *DiFranco,* 427 Mich at 56-57, Justice CAVANAGH has already provided an explanation for why this might be the case:

> Conflicting results have also arisen among cases involving similarly injured plaintiffs.  This is undoubtedly because no two plaintiffs are injured

whether the plaintiff in the *instant* case suffered an impairment that affects his general ability to lead his normal life, the majority itself repeatedly cites temporal considerations. For example, the majority indicates that "for *a month* after the incident, plaintiff could not bear weight on his left ankle"; "[h]e underwent two surgeries over a period of *10 months* and *multiple months* of physical therapy"; "after the incident he was unable to perform functions necessary for his job for at least *14 months*"; "he did not return to work for *19 months*"; and "he missed fishing for *a year* after the incident." (Emphasis added.) Are such temporal considerations irrelevant or relevant? Do we interpret the words or the actions of the majority? And, if temporal considerations are irrelevant, how are we to determine whether an impairment affects a plaintiff's "general ability to lead his normal life"? The majority does not appear to know the answers, and it appears not to care that it does not know.

Indeed, under the majority's new threshold, it would seem that the moment the plaintiff in this case went to the emergency room and it was determined that he had broken his ankle, the threshold was met. For at that moment, plaintiff could not work. While at the emergency room, and for some measurable time afterwards, plaintiff's

---

  or recover in precisely the same manner. These conflicting results indicate that threshold issues are often questions upon which reasonable minds can differ.

Moreover, *if* the Court of Appeals is inconsistently or incorrectly applying *Kreiner,* this Court has a mechanism to rectify such errors-- reversing such decisions, not overruling precedent and substituting an incomprehensible new standard bearing no relationship to the law being interpreted.

broken ankle affected not just some, but all, of his capacity to live his normal life. Under the majority's non-temporal test, there is apparently no need to consider anything beyond the emergency room visit. If this reading of its decision is wrong, once again, the majority might wish to explain why this is so for the benefit of the bench, the bar, and the public.

In crafting its new threshold, the majority would also have been wise to consider the larger no-fault statute. Recall that the Legislature has decided that an injured plaintiff should only be allowed to sue to recover noneconomic damages resulting from an automobile accident where he or she has suffered: (a) death; (b) permanent serious disfigurement; or (c) serious impairment of body function. MCL 500.3135. It is well established that "'[w]hen construing a series of terms . . . we are guided by the principle that words grouped in a list should be given related meaning.'" *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 114; 754 NW2d 259 (2008) (citation omitted). "In other words, this Court applies the doctrine of *noscitur a sociis,* which 'stands for the principle that a word or phrase is given meaning by its context of setting.'" *Id.* (citation omitted). Therefore, as this Court explained in *Cassidy,* 415 Mich at 503:

> In determining the seriousness of the injury required for a "serious impairment of body function", this threshold should be considered in conjunction with the other threshold requirements for a tort action for noneconomic loss, namely, death and permanent serious disfigurement. MCL 500.3135 . . . . The Legislature clearly did not intend to erect two significant obstacles to a tort action for noneconomic loss and one quite insignificant obstacle.[31]

---

[31] See also *DiFranco,* 427 Mich at 95 (WILLIAMS, C.J., concurring in part and dissenting in part) ("In the statutory language, 'serious impairment of body function'

34

In addition, the Legislature defined "serious impairment of body function" to mean "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7). Obviously, in enacting this threshold language, and in joining it with "death" and "serious permanent disfigurement," the Legislature was unlikely to have had in mind an impairment that only affected a plaintiff's ability to lead his normal life for a moment in time, with no consideration being given to the plaintiff's general ability to lead his normal life beyond that moment. Indeed, it is quite certain that this is not what the Legislature had in mind, given that the very premise of the no-fault act, and the core of the accompanying legislative compromise, was that *some* injured persons would *not* be able to recover *noneconomic* damages, so that *all* injured persons *would* be able to recover *economic* loss benefits regardless of fault.

## D. APPLICATION

As explained earlier, both *Kreiner* and the majority agree that the court must first determine whether there is a factual dispute that is material to the determination whether plaintiff has suffered a serious impairment of body function. Here, there are no material factual disputes. Before the accident, plaintiff worked approximately 60 hours a week and for the six months immediately before the accident, plaintiff's position was that of a medium truck loader. Additionally, plaintiff fished and golfed. Twelve months after the

---

appears with the other threshold requirements of 'permanent serious disfigurement' and 'death,' leaving the strong implication, under the rule of ejusdem generis, that while the impairment need not be permanent or fatal, it was not to be transient or trivial either.").

accident, plaintiff's surgeon cleared him to return to work with no restrictions. Seventeen months after the accident, plaintiff returned to work and has been able to perform all of his job duties since then. During the entire time he was recuperating, plaintiff could tend to his needs and there was no effect on his relationship with his then-fiancée. Additionally, plaintiff continued to fish and golf. Thus, I agree with the majority that there are no factual disputes that are material to the determination of whether plaintiff suffered a serious impairment of a body function. The facts are clear.

I also agree with the majority that the "body function" that was "impaired," the ability to walk, was "important," and that the impairment was "objectively manifested." Although plaintiff was able to walk to some extent, his ability to do so was impaired, and his impairment, a broken ankle, was recognized by his doctors. The final, and critical, inquiry in this case concerns whether the impairment affects plaintiff's "general ability to lead his normal life." This is where the majority and I depart. The *Kreiner* analysis requires a comparison of plaintiff's life before the accident and after the accident, including "the significance of any affected aspects on the course of the plaintiff's overall life." *Kreiner*, 471 Mich at 132-133. To aid in this analysis, the following factors may be considered:

> (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. [*Id.* at 133.]

Plaintiff's ability to walk, as just noted, was impaired by a broken ankle. However, once plaintiff's ankle was placed in a cast at the emergency room, he was able

36

to walk with the aid of crutches. And, immediately following his initial surgery in which a device was implanted to stabilize his ankle, plaintiff was still able to walk with crutches, although he was instructed not to place any weight on his ankle for one month. Plaintiff underwent physical therapy and nine months later, in October of 2005, plaintiff again underwent surgery to remove the device. By January 2006 (one year after the accident), plaintiff's surgeon had cleared plaintiff to return to work with no restrictions. However, plaintiff claimed that he could not keep up with the demands of his job and thus was placed back on workers' compensation. Although plaintiff's subjective reports of his pain from January 2006 forward varied greatly,[32] the March 2006 FCE supported plaintiff's claim that he could not fully perform all of his previous job duties; however, this was due in part to a preexisting and unrelated shoulder injury. After plaintiff's workers' compensation benefits were terminated, however, plaintiff requested another FCE, and, on August 1, 2006, the FCE showed that plaintiff was able to perform essential job demands with no restrictions. Plaintiff returned to work on August 16, 2006, and has been able to perform his job duties since that time.

---

[32] As already discussed, in January 2006, plaintiff reported to his surgeon that his ankle was not giving him any pain; in March of 2006, plaintiff reported during his FCE that his pain was a three out of ten; in June of 2006, plaintiff reported to his physiatrist that his pain was a six out of ten; in August 2006, plaintiff reported during his FCE that his pain was as low as zero out of ten (at which point, he returned to work); and in October of 2006, plaintiff reported during his deposition that his life was "normal" with some pain. These drastically inconsistent reports of pain demonstrate why, with regard to the "extent of any residual impairment," "[s]elf-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point." *Kreiner,* 471 Mich at 133 n 17.

Although plaintiff was assigned to a position that was less physically demanding than the position he had been performing before he was injured, plaintiff did this voluntarily and he suffered no loss in pay. Moreover, at the time plaintiff was injured, he had only been in that position for six months and, since he began to work for Allied in 2002, he had worked in three different positions. Thus, the fact that defendant was assigned to a different position upon his return is not particularly significant in this Court's analysis.

Plaintiff's only argument regarding his inability to lead his normal life is that he was unable to work at certain times. During the time he was recuperating, plaintiff could care for himself and tend to his household chores without assistance. His relationship with his fiancée/wife was unaffected. And he was able to enjoy his recreational activities without interruption. By plaintiff's own admission, his life was "normal" with some "occasional aching" that was not aggravated by any activities, including standing or prolonged walking. It is fair to say that by August of 2006 plaintiff had fully recovered from his broken ankle. Because only plaintiff's ability to work was affected and because this only lasted, at the very lengthiest, 17 months, the lower courts did not err in concluding that the impairment did not affect plaintiff's "general ability to lead his normal life" and, therefore, that plaintiff did not meet the "serious impairment of body function" threshold.

## E. STARE DECISIS

The majority overrules *Kreiner* while paying its usual lip service to stare decisis.[33]

My fundamental disagreement with the majority's application of the stare decisis doctrine

is quite easily summarized. In *Robinson v Detroit,* 462 Mich 439, 464; 613 NW2d 307

(2000), this Court drew on past caselaw and identified several relevant considerations in

determining whether a case should be overruled under stare decisis.[34] As explained

---

[33] It is of interest that this is the *second* time the authoring justice has authored an opinion overruling an earlier case making it easier for a plaintiff to establish a serious impairment of body function. In *DiFranco*, he authored an opinion overruling *Cassidy*. Justice WILLIAMS complained: "Four years after this Court issued its opinion in *Cassidy v McGovern,* 415 Mich 483; 330 NW2d 22 (1982), the majority sees fit to overrule the decision of five members of a six-member court and adopt the position of the dissent in that case." *DiFranco,* 427 Mich at 92 (WILLIAMS, J., concurring in part and dissenting in part). In this case, the authoring justice again sees fit to overrule a case that was decided only six years ago and to adopt his own dissenting opinion from that case. While it is by now clear what the authoring justice believes the no-fault policies of this state ought to be, it is considerably less clear what connection these views bear to those of the people and their Legislature.

[34] The fact that the lead opinion relies far more on Chief Justice KELLY's opinion in *Petersen*, which only Justice CAVANAGH joined, than on the majority opinion in *Robinson* should not go unnoticed. For a discussion of Chief Justice KELLY's *Petersen* standard for overruling precedent, see my dissent in *Petersen,* 484 Mich at 350.

Concerning the statements of Justices HATHAWAY and WEAVER about stare decisis:

> Justice HATHAWAY contends that stare decisis constitutes a "policy consideration" and that the "particular analytical approach will differ from case to case." Similarly, Justice WEAVER contends that stare decisis constitutes a "principle of policy" and that there is no need for a "standardized test for stare decisis," as long as justices exercise "judicial restraint, common sense, and a sense of fairness." The problem with these "approaches" is that "litigants will, of course, have no notice beforehand of which ["analytical approach"] will be employed, for the justices themselves

---

39

herein, *Kreiner* was the first occasion on which this Court was called upon to interpret the 1995 amendments to MCL 500.3135. *Kreiner* gave effect to the legislative intent as expressed in the language of the amended statute and was not, in my judgment, wrongly decided. Nonetheless, my disagreement with the majority on this point is not the thrust of this section. Rather, it is to remind the majority "that there are larger issues at stake in this case: the rule of law, respect for precedent, the integrity of this Court, and judicial restraint. Accordingly, larger institutional issues are implicated in this case." *Paige v City of Sterling Hts*, 476 Mich 495, 543; 720 NW2d 219 (2006) (CAVANAGH, J., concurring in part and dissenting in part).

Indeed, the author of the majority opinion, as one who subscribes to the doctrine of legislative acquiescence, has often argued that principles of stare decisis are *especially*

---

will not know this beforehand." *Petersen,* 484 Mich at 380 (MARKMAN, J., dissenting).

\* \* \*

Although Justice WEAVER is correct that "there are many factors to consider in deciding whether or not to overrule precedent," and Justice HATHAWAY is equally correct that the application of stare decisis must take place on a "case-by-case basis," this does not obviate the need to at least reasonably *attempt* to apprise the parties, and the citizens of this state, *before the fact* what some of these factors might be, as this Court did in *Robinson* and as the Chief Justice and Justice CAVANAGH did in *Petersen*. And, whatever else can be understood of Justice HATHAWAY's and Justice WEAVER's "approaches" to stare decisis, the application of these "approaches" has resulted in 13 precedents of this Court being overruled during this term alone, and 6 other precedents being teed up for possible overruling during the next term, doubtless a record pace for dismantling the caselaw of this state. [*Univ of Mich v Titan, Ins Co,* __ Mich __; __ NW2d __ (2010) (MARKMAN, J., dissenting).]

*strong* in matters of statutory interpretation.[35]  Accordingly, his own words are relevant

here: "[T]he majority does not adequately explain why it disregards the doctrine of stare

decisis in a matter of statutory interpretation when the Legislature itself has not seen fit in

[six] years to correct [*Kreiner*'s] allegedly incorrect interpretation."  *Id.* at 536.  To be

_____

[35] "[P]rinciples of stare decisis in matters of statutory interpretation, *particularly where the Legislature has not responded to a prior interpretation,* weigh against overruling precedent absent sound and specific justification."  *Paige*, 476 Mich at 540-541 (CAVANAGH, concurring in part and dissenting in part) (emphasis added); see also *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 613-614; 702 NW2d 539 (2005) (CAVANAGH, J., dissenting); *Neal v Wilkes*, 470 Mich 661, 676-677; 685 NW2d 648 (2004) (CAVANAGH, J., dissenting); *People v Moore*, 470 Mich 56, 78-79; 679 NW2d 41 (2004) (CAVANAGH, J., dissenting); *Jones v Dep't of Corrections*, 468 Mich 646, 665; 664 NW2d 717 (2003) (CAVANAGH, J., dissenting); *Mack v Detroit*, 467 Mich 186, 221-222; 649 NW2d 47 (2002) (CAVANAGH, J., dissenting); *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 767-768; 641 NW2d 567 (2002) (CAVANAGH, J., dissenting). Significantly, the authoring justice has gone so far as to suggest that "when this Court first interprets a statute, then the statute becomes what this Court has said it is," and that, absent further legislative action, "'[h]aving given our view on the meaning of a statute, our task is concluded, absent extraordinary circumstances.'"  *Paige,* 476 Mich at 537 (CAVANAGH, concurring in part and dissenting in part), quoting *Boys Markets, Inc v Retail Clerks Union*, 398 US 235, 257-258; 90 S Ct 1583; 26 L Ed 2d 199 (1970) (Black, J., dissenting) (emphasis omitted).  One cannot reconcile this view of legislative acquiescence and stare decisis with the majority's decision to overrule *Kreiner*.  *Kreiner* was this Court's first interpretation of the amended MCL 500.3135, and, although bills were subsequently introduced that would have abolished *Kreiner,* such bills were repeatedly rejected by the Legislature.  See, e.g., SB 1429 (2004); SB 618, HB 4846, and HB 4940 (2005); SB 445, HB 4301, and HB 4999 (2007); and SB 83 and HB 4680 (2009).  Therefore, what is the majority's "sound and specific justification" for departing from *Kreiner*?  *Paige*, 476 Mich at 541 (CAVANAGH, concurring in part and dissenting in part).  What are the "extraordinary circumstances" that make it appropriate to do so?  *Id.* at 538 (citation, quotation marks, and emphasis omitted).  While, in my view, this Court has correctly repudiated the doctrine of legislative acquiescence, see *Donajkowski v Alpena Power Co*, 460 Mich 243, 258-261; 596 NW2d 574 (1999), there is no principled reason why the *majority*, whose members are convinced advocates of this doctrine, chooses to ignore the Legislature's repeated rejection of attempts to abolish *Kreiner*, just as there is no principled reason why the majority chooses to ignore the Legislature's actions in amending MCL 500.3135 and the other forms of available legislative history.

fair, it is not only the author of the majority opinion, but *all* the justices who comprise the majority who should more clearly recognize the consequences of what they are doing. Even a cursory analysis of the majority's treatment of precedent since it ascended to power in January 2009 reveals a lack of sufficient regard for recent precedents that is directly contrary to their own previous assertions of the need not to needlessly overrule cases on account of stare decisis. Past complaints on their part that cases should not be overruled when the only thing that has changed is the membership of the Court have gone by the wayside.[36]

## 1. MAJORITY AND PRECEDENT IN 2009

The new majority assumed power in January 2009, and wasted little time in beginning its efforts to "undo" decisions of the previous majority.[37] On December 29, 2008, the former majority issued its opinion in *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n*, 482 Mich 414, 417; 759 NW2d 154 (2008). Soon

---

[36] *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 256; 731 NW2d 41 (2007) (KELLY, J., concurring in part and dissenting in part) ("The law has not changed. Only the individuals wearing the robes have changed."); *Paige*, 476 Mich at 532-533 (CAVANAGH, J., concurring in part and dissenting in part) ("The only change has been the composition of this Court. And unfortunately, this is the only reasonable answer to the question why a decision from this Court decided just eight years earlier and involving the same issue is now being overruled. But make no mistake, this answer is alarming, and it has become increasingly common."). As observed, after the composition of this Court changed when Justice HATHAWAY replaced former Chief Justice TAYLOR on January 1, 2009, this Court granted plaintiff's motion for reconsideration even though such motion had not raised any new legal arguments. 485 Mich 851 (2009).

[37] See Detroit Free Press, December 10, 2008, at A2, where Chief Justice KELLY promised to "undo . . . the damage that the Republican-dominated court has done."

after Justice HATHAWAY replaced former Chief Justice TAYLOR on January 1, 2009, the plaintiffs filed motions for rehearing. The new majority granted the plaintiffs' motions for rehearing, and the cases were resubmitted for decision "without further briefing or oral argument." 483 Mich 918 (2009). Then, in *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 46; __ NW2d __ (2009), the new majority reversed the former majority's decision.

In *Bush v Shabahang*, 484 Mich 156, 175 n 34; 772 NW2d 272 (2009), the majority stated that it "question[ed] whether *Roberts I* [*Roberts v Mecosta Co Gen Hosp*, 466 Mich 57; 642 NW2d 663 (2002)] and *Boodt* [*v Borgess Med Ctr*, 481 Mich 558; 751 NW2d 44 (2008)] were correctly decided . . . ." And, in *Potter v McLeary,* 484 Mich 397, 424 n 32; 774 NW2d 1 (2009), the majority said: "We question whether *Roberts II* [*Roberts v Mecosta Co Gen Hosp*, 470 Mich 679; 684 NW2d 711 (2004)] was correctly decided . . . ."

The majority's treatment of precedent in the seven-month period from when it took power until the end of the Court's term in July 2009 was well explained in earlier statements of mine and of Justices CORRIGAN and YOUNG. For example, in *Henry v Dow Chem Co*, 484 Mich 483, 528 n 28; 772 NW2d 301 (2009), Justice YOUNG observed in his partial dissent:

> The majority's determination to ignore facts and precedent inconvenient to its desired outcome has become its *modus operandi*. See, e.g., *Vanslembrouck v Halperin*, 483 Mich 965; 763 NW2d 919 (2009), where the new majority ignored *Vega v Lakeland Hospitals at Niles & St Joseph, Inc*, 479 Mich 243, 244; 736 NW2d 561 (2007); *Hardacre v Saginaw Vascular Services*, 483 Mich 918 (2009), where it failed to follow *Boodt v Borgess Med Ctr*, 481 Mich 558; 751 NW2d 44 (2008); *Sazima v*

43

*Shepherd Bar & Restaurant*, 483 Mich 924; 762 NW2d 924 (2009), where it failed to follow *Chrysler v Blue Arrow Transport Line*s, 295 Mich 606; 295 NW 331 (1940), and *Camburn v Northwest School Dist*, 459 Mich 471; 592 NW2d 46 (1999); *Juarez v Holbrook*, 483 Mich 970 (2009), where it failed to follow *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008)[38]; *Chambers v Wayne Co Airport Auth*, 483 Mich 1081 (2009), where it failed to follow *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197; 731 NW2d 41 (2007);[39] and *Scott v State Farm Mut Auto Ins Co*, 483 Mich 1032 (2009), where it failed to enforce *Thornton v Allstate Ins Co*, 425 Mich 643; 391 NW2d 320 (1986), and *Putkamer v Transamerica Ins Corp of America*, 454 Mich 626; 563 NW2d 683 (1997).

And, as Justice CORRIGAN stated in her dissenting statement in *Beasley v Michigan*, 483 Mich 1025 (2009):

> [T]he new majority's failure to abide by *Rowland* continues a growing and troubling trend.  Rather than forthrightly overruling that decision, it is increasingly becoming the practice of this Court to simply ignore precedents with which it disagrees. . . .
>
> \* \* \*
>
> On this Court, the new majority offers no articulable reasons whatsoever for its apparent detours from stare decisis.  Instead, the majority declines to explain whether--and, if so, why--it is overruling precedent despite the obvious appearance that it is doing so.  If it intends to alter legal principles embedded in this Court's decisions, then the new majority should explain its reasons clearly and intelligibly.  Instead, the new majority

---

[38] I dissented in *Juarez v Holbrook*, 483 Mich 970 (2009), stating:

> [T]he majority's disdain for *Smith* [*v Khouri*, 481 Mich 519; 751 NW2d 472 (2008)] is apparently viewed as adequate justification for ignoring *Smith*.  Rather than forthrightly overruling this decision, something the new majority is apparently loathe to do (perhaps because several majority justices repeatedly and loudly proclaimed fealty to stare decisis, and dissented, whenever the former majority overruled a precedent), it is increasingly becoming the modus operandi of this Court that relevant precedents simply be ignored.

[39] The majority also failed to follow *Rowland* in *Ward v Michigan State Univ*, 485 Mich 917 (2009).

44

overrules by indirection, or at least leaves the impression that it is doing so, thereby sowing the seeds of confusion and making it difficult for the citizens of this state to comprehend precisely what our caselaw requires. This appears to be an unfortunate return to our predecessors' past practice of "frequently pa[ying] little attention to the inconsistencies among its cases and declin[ing] to reduce confusion in [the Court's] jurisprudence by overruling conflicting decisions." *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 571 n 19 [702 NW2d 539] (2005).[40]

Additionally, in *Petersen*, 484 Mich 300, Chief Justice KELLY authored an opinion, joined only by Justice CAVANAGH, in which she indicated that she wanted to overrule *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), and *Lansing Mayor v Pub Serv Comm*, 470 Mich 154; 680 NW2d 840 (2004). In my dissent, I stated:

> Given that in this case the Chief Justice would expressly overrule, not one, but two of this Court's prior decisions,
>
> "one is naturally tempted to re-inquire, see *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 223-228; 731 NW2d 41 (2007) (MARKMAN, J., concurring), whether the ongoing dispute between the [former] majority and Justice KELLY over overrulings of precedent truly concerns attitudes toward stare decisis or merely attitudes toward particular previous decisions of this Court." [*People v Smith*, 478 Mich 292, 322-323 n 17; 733 NW2d 351 (2007).]
>
> "A justice's perspective on stare decisis is not evidenced by her willingness to maintain precedents with which she *agrees*, but by her willingness to maintain precedents with which she *disagrees*." *Rowland*, 477 Mich at 224-225 n 3 (MARKMAN, J., concurring). Now that the Chief Justice is positioned to overrule decisions with which she disagrees, her

---

[40] On the other hand, as I stated in *Rowland,* 477 Mich at 226-227:

> [T]he [former] majority has been disciplined in stating expressly when a precedent has been overruled. The [former] majority has never attempted to obscure when a precedent was overruled or to minimize the number of such precedents by dubious "distinguishing" of prior caselaw. Rather, it has been forthright in identifying and critiquing precedents that were viewed as wrongly decided and warranting overruling.

actions increasingly demonstrate that her former claims of fealty toward stare decisis were considerably overstated. Despite all her rhetoric concerning the importance of stare decisis for the exercise of the judicial power, see, e.g., her hollow claim that she possessed a "differing [and elevated] esteem for stare decisis" than another justice, *People v Gardner*, 482 Mich 41, 88 n 31; 753 NW2d 78 (2008), such rhetoric was in reality little more than a means of communicating her opposition to overruling particular past decisions with which she agreed. [*Petersen*, 484 Mich at 389-390 (MARKMAN, J., dissenting) (emphasis in the original).]

One other practice to which the new majority began to adhere in 2009 was requesting that the parties brief whether a decision of the former majority should be overruled. See, e.g., Justice YOUNG's partial dissent in *Potter,* 484 Mich at 450 n 43, in which he stated:

It is quickly becoming a new favored practice of the majority to flag decisions of the past decade and invite challenges to those decisions. It is difficult to reconcile this practice with the majority's previous claims of fidelity to stare decisis. See, e.g., . . . *Pohutski v City of Allen Park*, 465 Mich 675, 712; [641] NW2d 219 (2002) (KELLY, J., dissenting) ("[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable."); *Devillers, supra* at 620 (WEAVER, J., dissenting) ("Under the doctrine of stare decisis, it is necessary to follow earlier judicial decisions when the same points arise again in litigation."); *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 278; 731 NW2d 41 (2007) (CAVANAGH, J., dissenting) ("Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent and should not be lightly departed. Absent the rarest circumstances, we should remain faithful to established precedent.") . . . . See also Todd C. Berg, Esq., *Hathaway Attacks*, Michigan Lawyers Weekly, October 27, 2008, in which Justice HATHAWAY was quoted: "I believe in stare decisis. Something must be drastically wrong for the court to overrule"; *Lawyers' Election Guide: Judge Diane Marie Hathaway*, Michigan Lawyers Weekly, October 30, 2006, in which Justice HATHAWAY, then running for a position on the Court of Appeals, was quoted: "Too many appellate decisions are being decided by judicial activists who are overturning precedent." [Citations omitted.]

Thus, from January 2009 through July 31, 2009, the new majority reversed an opinion on rehearing, sowed seeds of confusion by questioning three cases decided by the former majority, i.e., *Roberts I*, *Roberts II,* and *Boodt,* failed to follow numerous other precedents as cited above, and began to issue orders requesting that the parties brief whether decisions made by the former majority should be overruled.[41] And Chief Justice KELLY and Justice CAVANAGH went on record urging the express overruling of two cases: *Robinson* and *Mayor of Lansing*.

## 2. MAJORITY AND PRECEDENT IN 2010

In 2010, the majority has accelerated efforts to "undo" numerous cases decided by the former majority through express overrulings and additional orders asking parties to brief whether a case should be overruled.

In *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010), the majority expressly overruled *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006). In *Lansing Sch Educ*

---

[41] The Detroit Free Press took note of the majority's actions and stated as follows in an October 11, 2009 editorial, *Restoring judicial restraint*:

> Even before the new term began, the new Democratic majority (buttressed by the renegade WEAVER) had signaled its own impatience to begin dismantling the Engler Court's legacy when it agreed to reconsider an appeal the court rejected just a month before TAYLOR'S departure. The revived appeal appears to hinge on the court's willingness to reverse two of the Engler court's more recent decisions.

> * * *

> Democrats can hardly reinvigorate stare decisis – the reasonable conviction that the rules of the game shouldn't change every time a new referee takes the field – by reversing every questionable call its predecessors made.

*Ass'n v Lansing Bd of Edu*, __ Mich __; __ NW2d __ (2010), the majority overruled *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), *Crawford v Dep't of Civil Serv,* 466 Mich 250; 645 NW2d 6 (2002), *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004), *Associated Builders & Contractors v Dep't of Consumer & Indus Servs Dir*, 472 Mich 117, 124-127; 693 NW2d 374 (2005), *Mich Chiropractic Council v Comm'r of the Office of Fin & Ins Servs*, 475 Mich 363; 716 NW2d 561 (2006), *Rohde v Ann Arbor Pub Sch*, 479 Mich 336; 737 NW2d 158 (2007), and *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280, 302-303; 737 NW2d 447 (2007), and *Manuel v Gill*, 481 Mich 637; 753 NW2d 48 (2008). In *Bezeau v Palace Sports*, __ Mich __; __ NW2d __ (2010), the majority expressly overruled the limited retroactive effect of *Karaczewski v Farbman Stein & Co*, 478 Mich 28; 732 NW2d 56 (2007). In *Univ of Mich v Titan Ins Co*, __ Mich __; __ NW2d __ (2010), the majority expressly overruled *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006). In *O'Neal v St. John Hosp,* __ Mich __, __ n __; __ NW2d __ (2010), the lead opinion authored by Justice HATHAWAY indicated its agreement with Justice CAVANAGH's partial dissent in *Wickens v Oakwood Healthcare Sys,* 465 Mich 53; 631 NW2d 686 (2001), which already had the support of three Justices (Chief Justice KELLY and Justices CAVANAGH and WEAVER). And, of course, in the case at bar, the majority has expressly overruled *Kreiner.* Finally, by amending MCR 2.112 and MCR 2.118 to allow amendments of affidavits of merit to relate back to the of the original filing of the affidavit, the majority effectively overruled *Kirkaldy v Rim,* 478 Mich 581; 734 NW2d 201 (2007). 485 Mich ___ (2010).

48

## 3. REVERSALS OF PRECEDENT TO COME

The majority's work, however, has apparently only just begun. It has already teed up six more cases in its grant orders for possible overruling. These include: *Mich Citizens v Nestlé Waters*, 479 Mich 280; 737 NW2d 447 (2007);[42] *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich 508; 684 NW2d 847 (2004);[43] *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378; 738 NW2d 664 (2007);[44] *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521; 697 NW2d 895 (2005);[45] *Rory v*

---

[42] This Court's grant order in *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 485 Mich 1067 (2010), inquired whether *Mich Citizens v Nestlé Waters*, 479 Mich 280; 737 NW2d 447 (2007), was correctly decided, and the majority denied a motion to dismiss in that case even though that case is now clearly moot. See *Anglers,* __ Mich __ (2010) (YOUNG, J., dissenting), order entered June 18, 2010 (Docket Nos. 138863 to 138866). Apparently, the majority just could not wait until next term to overrule *Nestlé Waters,* because it appears already to have done so in *Lansing Sch Educ Ass'n v Lansing Bd of Educ*, __ Mich __; __ NW2d __ (2010).

[43] This Court's grant order in *Anglers* also inquired whether *Preserve the Dunes* was correctly decided, and, as noted, the majority denied the motion to dismiss in that case even though it is now clearly moot. See *Anglers,* __ Mich at __ (2010) (YOUNG, J., dissenting), ordered entered June 18, 2010 (Docket Nos. 138863 to 138866).

[44] *Colaianni v Stuart Frankel Dev Corp*, 485 Mich 1070 (2010), inquired "whether *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, was correctly decided."

[45] This Court's grant order in *Wilcox v State Farm Mut Auto Ins Co*, 486 Mich 870 (2010), inquired "whether *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521 (2005), was correctly decided." This order is the majority's second tee-up of *Griffith.* The majority first requested that the parties brief whether *Griffith* was correctly decided in *Hoover v Mich Mut Ins Co*, 485 Mich 881 (2009), but that case was subsequently dismissed after a settlement, *Hoover v Mich Mut Ins Co*, 485 Mich 1036 (2010). However, the majority wasted little time in finding another case to use as a vehicle for reconsidering *Griffith.*

*Continental Ins Co*, 473 Mich 457; 703 NW2d 23 (2005);[46] and *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197; 731 NW2d 41 (2007).[47]

The new majority once purported to be concerned about the stability of the law,[48] but that concern appears to have passed with the passing of the former majority. Indeed, it is difficult to consider anything more destabilizing to the law than to have the majority issue multiple orders continually requesting that the parties brief whether recently decided cases have been properly decided. Justices who once postured as champions of stare decisis now cannot act quickly enough to reverse disfavored precedents. The majority's past claims of fealty to stare decisis were greatly exaggerated, and obviously nothing more than a function of their opposition to *particular* decisions being decided by the Court at the time.

### 4. HYPOCRISY AND STARE DECISIS

The majority accuses the dissenting justices of hypocrisy with regard to our stare decisis criticisms of the majority.

---

[46] This Court's grant order in *Idalski v Schwedt*, 486 Mich 916 (2010), inquired "whether *Rory v Continental Ins Co*, 473 Mich 457 (2005), should be reconsidered."

[47] This Court's grant order in *Pollard v Suburban Mobility Auth,* 486 Mich 963 (2010), inquired "whether this Court should reconsider *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197 (2007)."

[48] See, e.g., *People v Davis*, 472 Mich 156, 190; 695 NW2d 45 (2005), where then-Justice KELLY opined in dissent that overruling cases "destabilizes our state's jurisprudence. It suggests to the public that the law is at the whim of whoever is sitting on the Supreme Court bench. Surely, it erodes the public's confidence in our judicial system."

The dissenters' stare decisis protestations should taste like ashes in their mouths. To the principles of stare decisis, to which they paid absolutely no heed as they denigrated the wisdom of innumerable predecessors, the dissenters now would wrap themselves in its benefits to save their recent precedent. [*Ante* at __.]

However, the position of the dissenting justices on stare decisis has not changed a whit since we were in the majority; by contrast, the position of the majority justices is unrecognizable.

It has always been our position that stare decisis is not an "inexorable command," and that a judge's primary obligation is to the law and the constitution, not to the judgments of his or her predecessors. To that end, we have always asserted that there are multiple judicial values that must be assessed in any case in which previous decisions of the Court are implicated. In every such case, a judge must respectfully consider the interests served by stare decisis-- predictability and certainty in the law, and the uniformity of its application. However, in every such case, a judge must also consider the interests served by interpreting the law correctly-- regard for the lawmaker, adherence to constitutional dictates concerning the "judicial power" and the separation of powers, and competing predictability and certainty interests that are served where the law means what it plainly says. *Robinson,* 462 Mich at 464-468. As we explained in *Robinson*:

> [I]t is well to recall in discussing reliance, when dealing with an area of the law that is statutory . . . , that it is to the words of the statute itself that a citizen first looks for guidance in directing his actions. This is the essence of the rule of law: to know in advance what the rules of society are. Thus, if the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts. In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent

51

court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction. The reason for this is that the court in distorting the statute was engaged in a form of judicial usurpation that runs counter to the bedrock principle of American constitutionalism, i.e., that the lawmaking power is reposed in the people as reflected in the work of the Legislature, and, absent a constitutional violation, the courts have no legitimacy in overruling or nullifying the people's representatives. Moreover, not only does such a compromising by a court of the citizen's ability to rely on a statute have no constitutional warrant, it can gain no higher pedigree as later courts repeat the error. [*Id.* at 467-468.]

That has been the consistent approach of the dissenting justices, and this continues to be our approach. Respect for stare decisis is a critical judicial value, but so is a regard for the constitutional processes of government by which a judge strives to interpret the law in accordance with its actual language. Balancing these values is sometimes difficult, and reasonable people can often disagree as to how this balance should be struck. *Robinson* supplies one attempt at identifying the factors that courts have traditionally looked to in striking this balance in a consistent and reasonable manner. Despite suggestions to the contrary, *Robinson* does not establish a "mechanical" process, but simply attempts to afford reasonable guidance in achieving a fair equilibrium between stare decisis and getting the law right.[49]

However, as explained above, the justices now in the majority who were on the Court at the time took a quite different approach to stare decisis when they were in the minority. As Justice YOUNG has explained:

---

[49] Given that it has always been our position that *Robinson* does not establish a "mechanical" process, it is not surprising that the majority has been able to identify a *single* case in which we overruled precedent without specifically citing *Robinson*.

> [Our] position on stare decisis has not changed, and the [the majority] attempts to shift focus to [us] in order to avoid confronting [their] own inconsistency. The public should understand when Justices' positions on important matters shift. And that is the focus of this dissent: when the [majority] justice[s] [were] in the minority, [they] liked stare decisis a lot; now that [they are] in the majority, it is not an issue. That is the "irony" the public should understand. [*Anglers,* __ Mich at __ (2010) (YOUNG, J., dissenting), order entered June 18, 2010 (Docket Nos. 138863 to 138866).]

The majority entirely misapprehends our criticism of its record on stare decisis if it thinks that we are simply counting the number of occasions on which they have reversed precedent over the past term and a half. That is not our intention at all. We freely acknowledge that we too reversed precedents when we were in the majority-- although hardly at their remarkable pace. That is not the nub of our critique. Rather, the nub is: (a) that the majority justices have demonstrated a remarkably inconsistent and "flexible" attitude toward stare decisis, in which their views on the subject appear to be nothing more than a function of whether they are in the majority or the minority; and (b) that the majority justices equate their own reversals of precedent, in which they have *widened* the distance between the law of the lawmaker and the law of the court, with the previous majority's reversals in which we did the opposite.

"[N]o meaningful discussion of a court's attitude toward precedent can be based solely on an arithmetical analysis in which raw numbers of overrulings are simply counted. Such an analysis obscures that not all precedents are built alike, that some are better reasoned than others, that some are grounded in the exercise of discretionary judgments and others in the interpretation of plain language, that some are thorough in their analyses and others superficial." *Rowland v Washtenaw Co Rd Comm,* 477 Mich

197, 226; 731 NW2d 41 (2007) (MARKMAN, J., concurring). The chart set forth in *Rowland* demonstrates, we believe, that the overrulings of precedent that occurred between January 1, 2000 until *Rowland* was decided on May 2, 2007 "overwhelmingly came in cases involving what the justices in the majority [at that time] view[ed] as the misinterpretation of straightforward words and phrases in statutes and contracts, in which words that were *not* there were read into the law or words that *were* there were read out of the law." *Id.* That is, these reversals of precedent sought more closely to equate our state's caselaw with our statutes, while the reversals of precedent of the present majority have achieved exactly the opposite.

Thus, the present majority has regard neither for precedent nor for the most significant competing value that would sometimes warrant overturning a precedent, *to wit*, that it is not in accord with the words of the lawmaker. In the end, the majority's approach to stare decisis is empty and incoherent. The majority has unsettled the precedents of this Court at a Guinness world's record pace, and it has done so while disserving *both* the values of stare decisis and that of a court acting in accordance with the constitutional separation of powers to respect the decisions of the lawmaker. The majority has run amuck in service of values that have no grounding in either stare decisis, or in any other conception of the "judicial power," other than that they comprise an arithmetical majority of this Court. In this regard, the majority confuses power and authority. The majority unsettles and confuses the law *both* in its disregard for this Court's previous decisions and in its equal disregard for the language of the law. It compounds the confusion it fosters in one realm with the confusion that it fosters in the

54

other.[50]  There is no saving grace in its reversals of precedent, no balancing of difficult judicial principles, no apparent recognition of the values served by either of the competing considerations involved where precedents are at issue, and no thoughtful effort to articulate even the roughest principles for its actions.  In its destructive march through the caselaw of this state to identify surviving and straggling decisions that need to be "taken out," the majority furthers no discernible legal value of any kind, other than litigation and still more litigation.  In the end, there is no legal core to the majority's approach to stare decisis, and it is left with nothing other than a feeble effort to equate its own actions with those of the dissenting justices when they were in the majority.  "We are no worse than you," is the majority's banner, when in truth the majority has not the slightest conception of *our* approach to stare decisis, and not the slightest conception of the damage that their *own* approach to stare decisis is doing to the citizens of this state who wish to act in accordance with the law and who wish to understand their rights and obligations under that law.

## F.  UNDOING THE LEGISLATIVE COMPROMISE

As discussed earlier, although virtually all legislation involves some sort of compromise, the no-fault act, in particular, entailed a substantial and well-understood

---

[50] See, for example, The Detroit News, *Ruling Clouds Pot Smoking, Driving Law,* July 29, 2010 (indicating that the majority's recent overruling of *Derror* in *Feezel* "has police officers scratching their heads in confusion"; "The ruling mostly leaves law enforcement officers in a legal limbo, said Sgt. Christopher Hawkins, legislative liaison for the state police.").  <http://www.detnews.com/article/20100729/METRO/7290387#ixzz0v6dvSnGK> (accessed July 29, 2010).

compromise. In exchange for the payment of economic loss benefits from one's own insurance company (first-party benefits), the Legislature limited an injured person's ability to sue a negligent operator or owner of a motor vehicle for noneconomic losses (third-party benefits). *Kreiner*, 471 Mich at 114-115. As stated in *Stephens v Dixon*, 449 Mich 531, 541; 536 NW2d 755 (1995): "It was a specific purpose of the Legislature in enacting the Michigan no-fault act to partially abolish tort remedies for injuries sustained in motor vehicle accidents and to substitute for those remedies an entitlement to first-party insurance benefits."

> At least two reasons are evident concerning why the Legislature limited recovery for noneconomic loss, both of which relate to the economic viability of the system. First, there was the problem of the overcompensation of minor injuries. Second, there were the problems incident to the excessive litigation of motor vehicle accident cases. Regarding the second problem, if noneconomic losses were always to be a matter subject to adjudication under the act, the goal of reducing motor vehicle accident litigation would likely be illusory. The combination of the costs of continuing litigation and continuing overcompensation for minor injuries could easily threaten the economic viability, or at least desirability, of providing so many benefits without regard to fault. If every case is subject to the potential of litigation on the question of noneconomic loss, for which recovery is still predicated on negligence, perhaps little has been gained by granting benefits for economic loss without regard to fault.

> Regarding the trade-off involved in no-fault acts, 7 Am Jur 2d, Automobile Insurance, § 340, p 1068, contains the following:

> "It has been said of one such plan that the practical effect of the adoption of personal injury protection insurance is to afford the citizen the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses * * *. In return for this he surrenders the possibly minimal damages for pain and suffering recoverable in cases not marked by serious economic loss or objective indicia of grave injury, and also surrenders the outside chance that through a generous settlement or a liberal award by a judge or jury in such a case he

may be able to reap a monetary windfall out of his misfortune." (Footnotes omitted.)

Thus, it is apparent that the threshold requirements for a traditional tort action for noneconomic loss play an important role in the functioning of the no-fault act. [*Cassidy,* 415 Mich at 500-501.]

Accordingly, there is no question that the legislative compromise that produced the no-fault act recognized that some injuries would not be considered sufficient to meet the no-fault threshold. While every injury resulting from a motor vehicle accident certainly has adverse consequences, and may involve medical costs, treatment, and bodily pain, not all injuries rise to the level of the no-fault threshold of a "serious impairment of a body function." *Some* injured persons are able to recover *noneconomic* damages, so that *all* injured persons are able to recover *economic* loss benefits regardless of fault. Otherwise, "little has been gained by granting benefits for economic loss without regard to fault." *Id.* at 500. Indeed, "the excessive litigation of motor vehicle accident cases" would continue, and, yet, economic loss benefits would have to be paid regardless of fault. *Id.* In other words, plaintiffs would be able to recover economic loss benefits regardless of fault and without having to go to a jury, while these same plaintiffs would also be able to go to a jury and seek noneconomic benefits as well. That is not the compromise reached by the Legislature. In particular, it is a lose-lose proposition for those funding the no-fault system, i.e., all insured Michigan drivers.[51]

---

[51] The majority argues that the legislative compromise of 1973 which led to the adoption of the no-fault act itself cannot be cited to trump the 1995 enactment of MCL 500.3135(7). We agree, but it is our position that the 1995 enactment of MCL 500.3135(7), which in large measure rejected *DiFranco*, and made it more difficult for

In addition, it has been repeatedly recognized that, due to the mandatory nature of no-fault insurance, the Legislature intended that its cost be affordable. *Shavers,* 402 Mich at 599 ("The Legislature has . . . fostered the expectation that no-fault insurance will be available at fair and equitable rates.").[52] Indeed, because it is mandatory, it *must* be affordable. *Id.* at 600 ("We therefore conclude that Michigan motorists are constitutionally entitled to have no-fault insurance made available on a fair and equitable basis."). It is a matter of economic logic that in order to maintain a system in which motor vehicle accident victims are able to receive economic loss benefits regardless of fault, drivers must be required to purchase insurance, and in order to ensure that drivers purchase this insurance, it must be kept affordable. The majority's decision, however, very considerably "lowers the bar" that an injured plaintiff must satisfy in order to meet the serious impairment of body function threshold, making it significantly easier for a

plaintiffs to prevail in noneconomic loss benefit cases, is entirely consistent with the compromise. The majority's opinion is not in accord with *either* the compromise or MCL 500.3135(7).

[52] See, e.g., *Tebo v Havlik*, 418 Mich 350, 366; 343 NW2d 181 (1984) (opinion by BRICKLEY, J.) (recognizing that a primary goal of the no-fault act is to "provid[e] an equitable and prompt method of redressing injuries in a way which made the mandatory insurance coverage affordable to all motorists"); *Celina Mut Ins Co v Lake States Ins Co,* 452 Mich 84, 89; 549 NW2d 834 (1996) (holding that "the no-fault insurance system . . . is designed to provide victims with assured, adequate, and prompt reparations at the lowest cost to both the individuals and the no-fault system"); *O'Donnell v State Farm Mut Auto Ins Co*, 404 Mich 524, 547; 273 NW2d 829 (1979) (recognizing that the Legislature has provided for setoffs in the no-fault act: "Because the first-party insurance proposed by the act was to be compulsory, it was important that the premiums to be charged by the insurance companies be maintained as low as possible[;] [o]therwise, the poor and the disadvantaged people of the state might not be able to obtain the necessary insurance").

58

plaintiff to recover for noneconomic losses. This means insurance companies that issue no-fault policies will be financially obligated in more cases, and, as a result, will be required to pass along their increased costs to policyholders by way of increased premiums charged to Michigan drivers.[53] Today's decision, just as last term's decision by the new majority in *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1; __ NW2d __ (2008),[54] will eventually result in a substantial *increase* in premiums paid for their *mandatory* no-fault policies.[55]

---

[53] In *Univ of Mich v Titan Ins Co*, __ Mich __; __ NW2d __ (2010), the majority has overruled *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006). This overruling will also lead to significant cost increases to no-fault policies. Indeed, defendant Titan Insurance Company argued that overruling *Cameron* would have "devastating affects" on the orderly adjustment of no-fault claims and "threaten the viability" of the Michigan Assigned Claims Facility and the Michigan Catastrophic Claims Association because the gutting of the one-year back rule will lead to a flood of decades old no-fault claims seeking expensive family attendant care benefits. In addition, in *Hoover v Mich Mut Ins Co*, 485 Mich 881 (2009), the majority has asked the parties to brief whether *Griffith v State Farm Mut Auto Ins Co,* 472 Mich 521; 697 NW2d 895 (2005), "was correctly decided." No-fault insurance costs can be expected to rise even further if the majority overrules *Griffith,* which considered the parameters of an "allowable expense" under MCL 500.3107(1)(a).

[54] As a consequence of the majority's decision in *United States Fidelity Ins & Guaranty Co (On Rehearing)*, the Michigan Catastrophic Claims Association substantially increased the mandatory annual assessment no-fault policy holders must pay to the Association. According to the MCCA's own website, the annual assessment has increased forty percent in the last two years (from $104.58 per insured vehicle effective July 1, 2008 to June 30, 2009 to $143.09 per insured vehicle effective July 1, 2010 to June 30, 2011.). <http://www.michigancatastrophic.com> (accessed June 28, 2010).

[55] As stated in Justice YOUNG's dissent in *United States Fidelity Ins & Guaranty Co*, 484 Mich at 26, this increase in premiums is not pertinent to our analysis of the substantive issue beyond making the point that the majority is undoing the compromise embodied by the no-fault act. But having lost the battle with the majority over the legal

59

Every owner of a car that is driven on a public highway must buy certain basic coverages in order to register the vehicle and obtain license plates. MCL 500.3101(1). The Legislature has provided two incentives to ensure that owners purchase the required insurance. First, it is a misdemeanor to drive a motor vehicle without basic no-fault coverage. Under MCL 500.3102(2), if someone is convicted of driving without basic no-fault insurance coverage, he or she can be fined up to $500, incarcerated in jail for up to one year, or both. Second, the no-fault act precludes receipt of no-fault personal protection benefits if at the time of the accident the person was the owner or registrant of an uninsured motor vehicle involved in the accident. MCL 500.3113(b). Notwithstanding this criminal sanction, and this potential preclusion of no-fault benefits, it is estimated that 17 percent[56] of Michigan's approximately eight million motor vehicles[57] are still operated without a no-fault policy in effect. With such mandatory

analysis of the no-fault statute, the financial consequences of the majority's decision should not go unremarked.

[56] According to the Insurance Institute of Michigan's 2009 Fact Book, the Insurance Research Council (IRC) released a study in 2008 estimating Michigan's uninsured motorists rate at 17 percent. <http://www.iiminfo.org/Portals/44/Fact% 20Book%204%20Auto%20(19-29).pdf> (accessed June 28, 2010). Indeed, according to a July 11, 2010 editorial in the Detroit News, "Statistics suggest more than half the drivers in Detroit ignore state law by driving without coverage because they can't afford the premiums. That's a problem for their fellow motorists and for the state." <http://detnews.com/article/20100711/OPINION01/7110316/1008/OPINION01/With-credit-scoring-issue-decided--policymakers-should-explore-other-ways-to-trim-auto-insurance-costs#ixzz0tUKFqijI> (accessed July 14, 2010).

[57] According to the Insurance Institute of Michigan, as of 2008, Michigan had 8.2 million registered motor vehicles. <http://www.iiminfo.org/ Portals/44/registered% 20vehicles%2008.pdf> (accessed June 28, 2010).

policies now becoming even more expensive, one can also reasonably anticipate a corresponding increase in the already large number of uninsured vehicles being driven on our roads and highways.

The majority's decision will not only result in increased automobile insurance premiums, and more uninsured vehicles on our roads and highways, but it will also mean that substantially more lawsuits will be filed, even though an express goal of the no-fault act was to reduce "excessive litigation of motor vehicle accident cases." *Cassidy,* 415 Mich at 500. Yet, under the majority's opinion, more lawsuits will make their way to juries for the consideration of noneconomic loss benefits, straining our already overburdened courts.[58] As it is, no-fault automobile negligence cases remain a dominant

---

[58] If one reviews the new majority's decisions, it is difficult not to conclude that the only coherent theme of their jurisprudence is the fostering of litigation. They have virtually guaranteed as much by introducing uncertainty, doubt and confusion into the law, and by gratuitously interjecting irrelevant considerations into their opinions. See, e.g., *O'Neal*, __ Mich at __ (gratuitously calling into question the viability of *Wickens v Oakwood Healthcare Sys,* 465 Mich 53; 631 NW2d 686 (2001), a case having no relevance to that dispute); *Zahn v Kroger Co*, 483 Mich 34; 764 NW2d 207 (2009) (gratuitously observing that the parties to the contract were business entities "with equal bargaining power," as if the latter circumstance, not at all relevant in that case, might be relevant in a different case); *Anglers,* __ Mich at __, order entered June 18, 2010 (Docket Nos. 138863 to 138866 (refusing to dismiss a moot case); *Scott v State Farm Mut Auto Ins Co*, 483 Mich 1032; 766 NW2d 273 (2009) (relaxing the causal connection that must exist between an injury sustained and the ownership, maintenance or use of a motor vehicle in no-fault cases); *Decosta v Gossage*, 486 Mich 116; __ NW2d __ (2010) (refusing to enforce notice-of-intent requirements under MCL 600.2912b(2); *Chambers v Wayne Co Airport Auth*, 483 Mich 1081; 765 NW2d 890 (2009), *Beasley v Michigan*, 483 Mich 1025, 1025-1027; 765 NW2d 608 (2009), and *Ward v Michigan State Univ*, 485 Mich 917; 773 NW2d 666 (2009) (refusing to enforce pre-litigation notice requirements); *Adair v Mich*, __ Mich __; __ NW2d __ (2010) (reducing a Headlee Amendment plaintiff's burden of proof); *Lansing Sch Educ Ass'n v Lansing Bd of Educ*, __ Mich __ ; __ NW2d __ (2010) (nullifying historic standards for determining whether a

factor in Michigan civil filings every year. Indeed, of the 47,300 new civil case filings in Michigan circuit courts in 2009, 9,067-- approximately 20 percent of all civil cases-- were automobile related.[59] Given that many no-fault claims are settled without the filing of a lawsuit, the number of claims potentially affected by the majority's ruling is even higher.

The majority's decision will also increase costs incurred by the state of Michigan itself (and, of course, the taxpayers who fund those costs). In the course of arguing that *Kreiner* should not be overruled because it "clarifies rather than expands the statutory language," the Attorney General's amicus brief warns that if *Kreiner* is overruled, as a

---

plaintiff has "standing" to bring a lawsuit); *Univ of Mich v Titan Ins Co*, __ Mich __; __ NW2d __ (2010) (eroding the no-fault act's one-year-back rule); *O'Neal*, *supra* (concluding that whichever lost-opportunity formula benefits the plaintiff the most in any particular case is the correct formula to be utilized); *Vanslembrouck v Halperin*, 483 Mich 965; 763 NW2d 919 (2009) (incorrectly characterizing MCL 600.5851(7) as a statute of limitations that can be tolled rather than a savings provision that cannot be tolled); *Sazima v Shepherd Bar & Restaurant*, 483 Mich 924; 762 NW2d 924 (2009) (expanding what injuries can be considered to have occurred "in the course of employment" for purposes of worker's compensation); and the 2010 amendments of MCR 2.112 and MCR 2.118 (undermining affidavit of merit requirements). In the instant case, of course, the majority, by undermining the no-fault compromise struck by the Legislature, makes it easier for plaintiffs to sue for noneconomic loss benefits.

[59] See 2009 Annual Report of the Michigan Supreme Court, pps 35-36. <http://www.courts.michigan.gov/scao/resources/publications/statistics/2009/2009execsum.pdf> (accessed June 28, 2010).

self-insured entity, the state will realize "a direct, significant increase in the cost of its litigation and coverage obligations."[60]

Finally, and as a consequence of all of the above, the majority's decision will almost certainly call into question the long-term economic integrity of the present no-fault system in Michigan. By nullifying the legislative compromise that was struck when the no-fault act was adopted-- a compromise grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance-- the Court's decision today will restore a legal environment in which each of these hazards reappear and threaten the continued fiscal soundness of our no-fault system.[61]

## IV. CONCLUSION

The no-fault automobile insurance act, MCL 500.3135(1), provides that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." The issue here is whether plaintiff has suffered a serious impairment of body function.

---

[60] It was reported that, as of 2007, the state vehicle fleet totaled 11,856. <http://www.greatlakeswiki.org/index.php/Michigan_state_fleet_efficiency> (accessed June 28, 2010).

[61] I reiterate that expected increases in no-fault premiums are not pertinent to our analysis of the legal issues in this case, beyond making the point that the majority is undoing the legislative compromise embodied by the no-fault act and that there will be significant practical consequences to doing this.

"'[S]erious impairment of body function' means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(7).

In *Kreiner,* 471 Mich at 132-133, this Court held that in determining whether the impairment affects the plaintiff's general ability to lead his normal life, "a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life." In addition, *Kreiner* indicated that certain factors, such as the duration of the impairment, may be of assistance in evaluating whether the plaintiff's general ability to lead his normal life has been affected. *Id.* at 133.

The majority overrules *Kreiner*, rejecting these factors and holding that *temporal* considerations are wholly or largely irrelevant in determining whether an impairment affects the plaintiff's general ability to lead his or her normal life. The majority apparently holds instead that as long as a plaintiff's general ability to lead his normal life has been affected for even a single moment in time, the plaintiff has suffered a serious impairment of body function. This conclusion is at odds with the actual language of the statute and nullifies the legislative compromise embodied in the no-fault act. Because I believe that *Kreiner* was correctly decided and that temporal considerations are, in fact, highly relevant, and indeed necessary, in determining whether an impairment affects the plaintiff's general ability to lead his normal life, I would sustain *Kreiner.* By nullifying the legislative compromise over the no-fault act-- a compromise grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of

affordable insurance-- the Court's decision today will revive a legal environment in which each of these hazards reappear and threaten the continued fiscal integrity of our no-fault system.

Because I do not believe that the lower courts erred in concluding that plaintiff has not suffered a serious impairment of body function, I would affirm the judgment of the Court of Appeals.

CORRIGAN and YOUNG, JJ., concurred with MARKMAN, J.